709 A.2d 1194

**Kyriakos S. ARGYROU a/k/a Charles S. Argyrou**

v.

**STATE of Maryland.**

**No. 63, Sept. Term, 1996.**

Court of Appeals of Maryland.

May 18, 1998.

588

T. Joseph Touhey, Glen Burnie, for petitioner.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI * and RAKER, JJ., and
MARVIN H. SMITH, Judge, (retired), Specially Assigned.

BELL, Chief Judge.

The issue that Kyriakos S. Argyrou, a/k/a Charles Argyrou, the petitioner, presents is whether the Circuit Court for Anne Arundel County abused its discretion when it denied his motion, pursuant to Md. Rule 4–331(c)[1] and premised on newly discovered evidence, for a new trial. The evidence upon

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. Maryland Rule 4–331(c) provides, in pertinent part:

> "(c) Newly Discovered Evidence.—the court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

which the petitioner relied and denominated newly discovered consisted of a confession by one Robert Lee Benner, Jr., which was submitted in affidavit and audio taped form to the court. The circuit court denied the petitioner's motion, concluding that the confession did not qualify as newly discovered evidence.

## I.

The facts are not in dispute. The petitioner was convicted by a jury in the Circuit Court for Anne Arundel County of theft of property valued at more than $300.00. The State's proof established to the jury's satisfaction beyond a reasonable doubt, that the petitioner was one of two men,[2] who, on June 30,1992, using the stolen identification of Robert Flens, rented construction equipment, to wit, a jack hammer with four bits, a 2,500–watt generator, an electric breaker, and a cart, from Taylor Rental, located in Glen Burnie, Maryland, which they took away in a van, described as light-colored, *i.e.* beige or powdery blue, and did not return. Specifically, an employee of Taylor Rental selected the petitioner's photograph from a photographic array, prepared by the detective investigating the case, and identified the petitioner at trial as the man who claimed to be Robert Flens and who signed the rental agreement. Also, the real Robert Flens testified that he had not rented the equipment and that his wallet, containing his identification and credit cards, had been stolen prior to the Taylor Rental theft. The petitioner was sentenced to five years imprisonment and ordered to pay a $1000.00 fine and $2000.00 restitution to Taylor Rental Company. The Court of Special Appeals affirmed his conviction in an unreported opinion.

The petitioner moved for a new trial, citing what he contended was newly discovered evidence. The newly discovered

---

\* \* \*

(2) in the circuit courts, on motion filed within one year after its imposition of sentence or its receipt of a mandate issued by the court of Appeals or the Court of Special Appeals, whichever is later."

**2.** A third man waited outside in a van.

evidence was, the petitioner asserted, a confession by one Robert Benner, in which Benner admitted committing the Taylor Rental theft and, at the same time, fully exonerated the petitioner. The confession was in the form of a notarized statement, his affidavit, taken by the petitioner's attorneys, when Benner came to their office. The confession was corroborated by handwriting exemplars given by Benner; one of his signature, and the other, Benner's signing of the name "Robert Flens." These exemplars were the subject of expert testimony.

A hearing was held on the motion for new trial. Benner was not present at the hearing,[3] and, so, did not testify. Instead, Benner's notarized statement, *i.e.* his affidavit, was introduced into evidence. In that statement, after acknowledging that he was on probation and the inculpatory nature of the statements he was about to make, denying that he had been coerced to make them, and recognizing that he could be prosecuted and jailed, and his probation violated as a result, Benner stated that he was involved in the Taylor Rental theft, along with Rodney Seekford and Michael Raub. Benner claimed Seekford acquired the various Flens identifications, which they used to obtain the construction equipment. He admitted that he signed the rental contract. Benner was asked specifically if the petitioner signed the rental contract, to which he positively stated that he had not.

The statement also contained an account of an incident, involving the use of the same credit cards, that occurred at the Marley Station Mall and that concededly involved the petitioner. According to Benner, he and Seekford had gone to the Mall in order to use the stolen credit cards, to acquire, for resale, expensive tennis shoes. Michael Raub was supposed to be waiting outside for them with a car. Benner stated that he became suspicious when a transaction between a clerk and

---

**3.** Benner had been present in court at a prior new trial motion hearing, which was postponed for the purpose of allowing the State to investigate.

Seekford took too long, and he saw a security guard approaching the store where the transaction was occurring and, so, he alerted Seekford and they left. When they exited the Mall, Raub was not in sight, but there were "several police coming out the door and ... a jeep ... was right there on top of us." Having seen a man, the petitioner, sitting in a van, Benner said that he "more or less commandeered the van by jumping into it and putting a knife into his [petitioner's] back and telling him to drive." The jeep followed for a time, but then "veered off," at which time Benner told the petitioner to pull into a Wendy's fast food restaurant, the previously agreed destination point where Raub was to meet him and Seekford, should something go wrong. Benner stated that they met up with Raub, who was driving a blue Grand Prix. Benner again exonerated the petitioner, stating that he had nothing to do with the Marley Station matter.[4] He described the petitioner's van as "maroon" in color and the van they used to haul away the construction equipment as "white."

After one of the petitioner's attorney's testified to the circumstances surrounding the acquisition of the handwriting exemplars, especially that of Benner signing "Robert Flens," noting specifically that the Taylor Rental rental agreement had not been shown to Benner, expert testimony was presented as to whether the same person signed the rental agreement as signed the exemplars. The expert, Katherine Koppenhav-

---

4. This account is consistent with the account of the car-jacking that the petitioner gave to the police when he reported the incident. Within an hour of the Marley Station Mall incident, the petitioner called the Anne Arundel County Police Department and reported that he had been car-jacked. According to the petitioner, he was sitting in his van at the Marley Station Mall when two men, one wielding a knife, jumped in and forced him to drive down Ritchie Highway, eventually telling him to pull into a Wendy's parking lot. The petitioner also stated that, after he pulled into the Wendy's parking lot, he jumped out of the van and ran, but while running away, he saw the two car-jackers get into a blue car and leave. When he returned to his van, the petitioner claimed, he discovered that sixty dollars were missing from the vehicle.

Benner was not asked by the petitioner's counsel whether he or Seekford took anything from the petitioner or the van. In a statement given to the Assistant State's Attorney, however, Benner denied taking anything from either.

er, having been qualified as an handwriting expert, testified without equivocation that it was Benner who signed the name of "Robert Flens" on the June 30, 1992 Taylor Rental contract.

In addition to the audio-taped statement that it took from Benner, the State offered testimony from two witnesses, Detective Ronald Sappington, who investigated the Taylor Rental matter, and Scott Rowe, the Marley Station Mall security officer who observed Benner and Seekford enter the petitioner's van and the petitioner drive away. Benner's audio-taped statement was more detailed than the one he gave the petitioner's attorneys, perhaps demonstrating, as the petitioner contended, that the State took the "opportunity to cross-examine Mr. Benner," in an effort "to challenge Mr. Benner at length regarding his alleged involvement in the crime."

In his statement, Benner stated that he did not know the petitioner and had not seen him before the day that he forced the petitioner, at knife-point, to drive him and Seekford away from the Marley Station Mall. He also stated, however, that about six months after that incident, in the western part of Baltimore City, where he had gone to buy drugs, he saw the petitioner and the van and "it clicked together," *i.e.,* he recognized the petitioner as the person he car-jacked. At that time, Benner maintained that he began making inquiries about the petitioner. Initially Benner said that he sought to discover if the petitioner had identified him to the police as the person who had car-jacked him at the Marley Station Mall. Later, the focus was on what happened to the petitioner. As a result of these inquiries, made of various individuals in the area, Benner learned that the petitioner had been convicted of the Taylor Rental theft and sentenced to five years imprisonment. With that information and having learned who the petitioner's attorney was, Benner said that he went to petitioner's attorney's office and confessed.[5] As to why he did so, Benner had this to say:

---

5. According to the statement, Benner learned of the petitioner's plight about three months prior to giving the statement to the State, or no

"I had found out from his attorney. I mean, the night that I was there, he had kids but I'm more or less trying to get my life back. I don't want nobody doing five years for something that they didn't do. I mean, it's —— I guess maybe crime is not my, you know, something that I like I do. Maybe I just have the right outlook for it."

Later, he gave another reason for coming forward and confessing: Benner said that it was not simply because it bothers his conscience, but also because it could help him get off drugs, which he wanted to do. As he put it,

"Well, I mean you know, apparently, you know, I'm going to be incarcerated here for a short period of time. And however short period of time will be time that I'm away from drugs."

At the beginning of the interview, Benner had explained why he'd come to the State's Attorney's office:

"... I have a lot of personal problems myself that I'd like to get straightened out, and this is one way that I feel I can go about it. But also, I can't ??? see somebody else actually taking the blame for something I've done. You know, I'm trying to put my life back together and this is something that I don't want to come back in the future. So, I'd like to get it ironed out."

Benner did not name anyone from whom he received information about the petitioner. Even when pressed, he gave only the names, "Bob," whose last name he claimed not to know, and "Gary or something," again claiming not to know the last name. And he also refused to point out any of the

---

earlier than August 1994. Benner did not act immediately, however. In response to the question what did he do after learning that the petitioner had been sentenced to five years and the name of his attorney, Benner stated:

"Nothing. I mean, I sat over a month or so thinking about it and you know, maybe I started to feel guilty after a month or so. And then I —— I don't know, maybe it was a mistake I made or whatever but on a whim I decided, you know, maybe I'll try to help the gentleman out."

persons he said he spoke with to the State, explaining that he was not "trying to get anyone else involved in this."

The State's questioning of Benner leaves no doubt that it did not consider him or his story to be reliable. In that regard, the State inquired why Benner had failed to meet with the Assistant State's Attorney following the postponed hearing on the motion for new trial. Benner had apparently agreed to do so, but did not. Benner also failed to meet with the Assistant State's Attorney two days later, again, as he also had agreed. The interview likewise contained references to Benner's failure to respond to letters the State sent to him. Benner's answers were not very enlightening. As to the first question, for example, he offered only, "I was—yeah, I was a little maybe—caught me a little off guard, maybe a little apprehensive. Thought maybe I should get—try to get an attorney or something before I talked ??."

The Assistant State's Attorney informed the court that, at the conclusion of the interview, he accompanied Benner down to the cafeteria to get him something to eat and drink. When they returned to the office, he continued, Benner told him that he was going to take a smoke. The Assistant State's Attorney then informed Benner that he wanted him to remain so that he would be present when the detective who was going to interview Benner arrived. Notwithstanding that Benner stated that he would be glad to cooperate and was simply going to take a smoke, the Assistant State's Attorney asserts that Benner left the building and disappeared, not to be seen again by the State. He also maintains that letters subsequently sent to Benner's home produced no result.

Testifying at the hearing, Sappington testified that he was involved in the investigation of the Taylor Rental theft. He explained why his attention was drawn to the petitioner as a suspect in that theft—after speaking to Flens, and learning that his credit cards and identification had been used at various stores other than Taylor Rental, including stores in the Marley Station Mall, he also learned that, on July 2, 1992, the petitioner had reported being car-jacked shortly after the

occurrence of an incident at the Marley Station Mall in which the Flens credit cards and identification were used. When asked "when he joined [the petitioner] and the Flens deal together," Sappington explained:

"Uhm, yes. The thing being is that what seemed funny to me was—is that he was reporting a abduction to where Mr. Flens' identification and credit cards were used in some thefts and attempt thefts, and plus the Taylor Rental case where, uhm, [the Taylor Rental employee], after being showed a photo line-up picks out [the petitioner] as the person who used the identification of Mr. Flens. I don't know what the odds of that would be, but I think it would be really thin, I would think, just in my opinion."

He thus thought it more than coincidental that the petitioner, who had been identified with the Taylor Rental theft just two days before, would have been abducted by men who had used the same identification and credit cards as had been used to effect that theft.[6]

Sappington also testified that he attempted, without success, to interview the petitioner concerning his car-jacking complaint. In fact, although he did speak to the petitioner, Sappington asserted that the petitioner declined his invitation to come by his office to discuss the case, and otherwise refused to speak to him about the incident. According to

---

**6.** Detective Sappington explained why he focused on the petitioner as a suspect in the Taylor Rental case. He stated that he learned from speaking with the officer who took the petitioner's report of being car-jacked, that the petitioner was, when he called, "very jumpy and nervous, seemed very jumpy and nervous, like, hyper." That description along with the additional fact of the description, given by the Taylor Rental employee, of one of the suspects in the Taylor Rental theft, *i.e.* "[a] short white male, five foot six, twenty-seven to twenty-eight years old, very nervous and jumpy," caused Sappington to become suspicious and to suspect that the petitioner might be connected to the Taylor Rental case. His suspicions thus aroused, Sappington said that he showed the Taylor Rental employee who described the men who rented the stolen equipment six photographs, one of which was a photograph of the petitioner. The employee selected the petitioner's photograph as depicting one of the perpetrators of the Taylor Rental theft, the one who signed the rental contract.

Sappington, the petitioner claimed to have spoken to a lawyer, whose phone number he purported to give to Sappington. When Sappington called the number, a woman answered and stated that she had never heard of either the lawyer or the petitioner. Sappington also testified that the only time the petitioner cooperated in the investigation was following his conviction. At that time, Sappington stated, the petitioner called and made an appointment to give Sappington his handwriting samples; however, the detective was told by the petitioner's counsel "not to talk to [the petitioner] about anything, just take the handwriting sample."

The Marley Station Mall Security officer testified about the circumstances surrounding the petitioner's "abduction." He testified that, having been alerted by a call from the Athlete's Foot, a store in the Marley Station Mall, that "they had some suspicious subjects in the store, possibly using a stolen credit card," he went to the store. Finding no one there at that time, the officer continued, he obtained a description of two men who had been in the store attempting to make a purchase in excess of $300.00. The officer stated that another security officer radioed another description of two men whom that security officer had observed in the Foot Locker. Armed with that description, the officer located them and followed them from that store. The men, he observed, "walked, uh, rather hurriedly. They weren't running, it was just a quick pace, uh, directly to one of the mall exits." Once outside on the sidewalk, the officer stated that the men "appeared to be looking around for the car, for a ride, or where they—they were looking over the parking lot itself, trying—it appeared to me that they were looking for—their car." After about ten seconds, he concluded "that, uh, someone got their attention." Although the officer did not see the wave, he assumed that it was done with a wave; he testified initially that he "didn't hear any voices, or any yells or anything like that, any whistles or __" and later that, "I didn't hear—a call, I didn't hear a whistle. I'm assuming it was—it was a wave or he just stood there long enough to be seen. I don't know." The officer believed that what got the men's attention was a light

colored van, to which they walked quickly and entered the front passenger door. He further testified that there did not appear to be any animosity between the driver of the van and the two men who entered it as passengers, and that he did not observe the use of any force. And the driver of the van did not, he said, give any distress signal. The officer stated that he did not see the driver of the van, but he did note the license tag number.

The trial court denied the petitioner's motion for a new trial. It reasoned:

"As I said before, I believe the testimony of Mr. French [petitioner's attorney] with regard to the scenario that he testified with regard to the person that came in and told him that he [Benner] was the signer of the name in question in this case and I believe the testimony with regard to the fact that [Benner] did sign in front of him [French], and in reviewing the signature I find that the signature is remarkably like that of the document on the case. I believe that if the testimony of that signer was elicited before a jury it may well produce a verdict of acquittal, as opposed to a verdict of guilty that occurred in this case.

"What I do not believe is that this is newly discovered evidence. I do not believe the defendant learned of the identity of this person and this testimony ... after the trial of the case. The burden is upon the defendant to prove this at this time, and I find that the defendant has not met that burden that it's newly discovered evidence.

"Therefore, I deny the motion for new trial. . . . I take [the affidavit] as evidence and take that if that fellow [Benner] went in and testified before the jury I think very well there would be a different verdict in this case ... I just find that it was not newly discovered evidence. Now, I think it's upon him [the petitioner] to ... establish that at this time ... and I find that it was not newly discovered."[7]

---

**7.** At the hearing on the motion for new trial, the trial court expressed concern whether an affidavit, rather than live testimony, suffices as newly discovered evidence for purposes of the Rule. Indeed, it asked

His motion for reconsideration having been denied, the petitioner noted an appeal to the Court of Special Appeals. That court affirmed the judgment of the circuit court in an unreported opinion, holding that the trial court did not abuse its discretion when it determined that the evidence offered as newly discovered evidence was not, in fact, newly discovered. We granted certiorari to consider this important question. We shall affirm.

## II

That a new trial may be granted in a criminal case tried before a jury cannot be doubted and, indeed, is well settled. *In re Petition for a Writ of Prohibition,* 312 Md. 280, 308, 539 A.2d 664, 677, 686 (1988). *See also Ford v. State,* 12 Md. 514 (1859); Md.Code (1957, 1995 Repl.Vol.) Art 27, § 594.[8] A trial court has wide latitude in considering a motion for new trial and may consider a number of factors, including credibility, in deciding it; thus, the court has the authority to weigh the evidence and to consider the credibility of witnesses in deciding a motion for a new trial. *Id* at 325–26, 539 A.2d at 686. In *In re Prohibition,* the new trial motion was based on the contention that the jury's verdict was against the weight of

---

counsel to address the question whether the Rule contemplates that the newly discovered evidence be evidence that is admissible at trial. Although the petitioner filed a memorandum addressing that issue, the trial court did not decide the issue. Instead, it found the evidence offered to be sufficient to permit the grant of a new trial had it been newly discovered. Consequently, we will not consider this threshold issue initially raised by the court.

8. Maryland Code (1957, 1995 Replacement Volume) Article 27, § 594 provides:

"All motions for new trials in criminal cases shall be heard by the court in which said motion is pending within ten days after the filing of said motion, or, in the event of an agreed statement of the evidence, or a statement of the evidence certified by the judge before whom the case was tried, is filed, within ten days after the filing of said statement; provided, however, that the time for the hearing of any such motion may be extended either by an agreement in writing, signed by the State's Attorney of the county or the City of Baltimore, wherein such motion is pending, and by the defendant or his counsel, or by an order signed by the trial judge."

the evidence. The trial courts also have authority to weigh the evidence and to consider credibility of witnesses when the motion is grounded on newly discovered evidence. *Yorke v. State*, 315 Md. 578, 582, 556 A.2d 230, 231–232 (1989). *See also Jones v. State*, 16 Md.App. 472, 477, 298 A.2d 483, 486 (1973) ("It is essentially the function of the trial judge to evaluate and assess the newly discovered evidence and where such evidence consists of testimonial evidence from a witness allegedly discovered after the trial has been concluded, it is for the trial judge to determine the materiality and the credibility of such testimony."); *Jones v. United States*, 279 F.2d 433, 436 (4th Cir.), *cert. denied*, 364 U.S. 893, 81 S.Ct. 226, 5 L.Ed.2d 190 (1960) ("Where there is a grave question of the credibility of after-discovered evidence ... the role of the trial judge is that of the fact-finder.").

■■■ It may be said that the breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable, it will expand or contract depending upon the nature of the factors being considered, and the extent to which its exercise depends upon the opportunity the trial judge had to feel the pulse of the trial, and to rely on his or her own impressions in determining questions of fairness and justice. *Buck v. Cam's Rugs*, 328 Md. 51, 58–59, 612 A.2d 1294, 1297. Of course, the exercise of the discretion is reviewable for abuse. *Wiggins v. State*, 324 Md. 551, 570, 597 A.2d 1359, 1368 (1991); *Yorke*, 315 Md. at 590, 556 A.2d at 235–236; *Stevenson v. State*, 299 Md. at 304, 473 A.2d 450,

■■■ Maryland Rule 4–331(c) provides for the grant of a new trial, or other appropriate relief, on the basis of newly discovered evidence, but only if the prescribed requirements are met. To qualify as "newly discovered," evidence must not have been discovered, or been discoverable [9] by the exercise of

---

9. Exculpatory evidence known, at the time of trial, or, as in Maryland, prior to the expiration of the time for filing a motion for new trial, though unavailable, in fact, is not newly discovered evidence, and, thus, will not suffice as a ground on which to grant a new trial. *Jones v. Scurr*, 316 N.W.2d 905, 909 (Iowa 1982); *State v. Lufkins*, 309 N.W.2d

due diligence, within ten days after the jury has returned a verdict.[10] In addition, the motion premised on newly discovered evidence must have been filed in the circuit court, within the later of one year after the imposition of sentence or the issuance of a mandate by the appropriate appellate court. Maryland Rule 4-331(c)(2). Case law has delineated other essential requirements. The evidence offered as newly discovered must be material to the result and that inquiry is a threshold question. *Stevenson v. State*, 299 Md. 297, 302, 473 A.2d 450, 452 (1984). That means that it must be more than "merely cumulative or impeaching." *Jones v. State*, 16 Md. App. 472, 477, 298 A.2d 483, 486 (1973); *Love v. State*, 95 Md.App. 420, 432, 621 A.2d 910, 917 (1993). In addition, the trial court must determine that "[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Yorke*, 315 Md. at 588, 556 A.2d at 235.[11]

---

331, 336 (S.D.1981); *State v. Sparks*, 171 W.Va. 320, 298 S.E.2d 857, 861 (1982).

**10.** Maryland Rule 4-331(a) prescribes when a motion for new trial must be filed. It provides:

(a) *Within ten days of* verdict.-On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

Consequently, since section (c) of the Rule defines the outside limit of discoverability for purposes of newly discovered evidence in terms of when the motion for new trial must be filed, it follows that any evidence that was incapable of discovery before that date may be determined to be "newly discovered evidence."

**11.** Although the factor relating to the outcome of the case is different, it being somewhere in between the "might affect" standard and the "probably would affect" standard, see, *Yorke v. State*, 315 Md. 578, 586-588, 556 A.2d 230, 234-235 (1989), in all other respects, the factors we apply are compatible with the tests applied in the majority of our sister States and the federal courts. *See, e.g. See State v. Estrada*, 537 A.2d 983, 985 (R.I.1988); *State v. Sparks*, 171 W.Va. 320, 298 S.E.2d 857, 860 (1982); *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534, 537, (1979), *State v. Brown*, 528 A.2d 1098, 1104 (R.I.1987) *See also Stanford v. Iowa State Reformatory*, 279 N.W.2d 28, 32-33 (Iowa 1979)

But, like materiality, *see, Stevenson,* 299 Md. at 302, 473 A.2d at 452, whether the proffered evidence is, in fact, "newly discovered evidence which could not have been discovered by due diligence," is a threshold question. Thus,

> "[u]nless and until there is found to be 'newly discovered evidence which could not have been discovered by due diligence,' one does not weigh its significance. It is only when this definitional predicate has been established that the provisions of Rule 4–331(c) even become involved. Without this definitional predicate, the relief provided by subsection (c) is not available, no matter how compelling the cry of outraged justice may be."

*Love,* 95 Md.App. at 432, 621 A.2d at 916–17. The question of whether evidence is newly discovered has two aspects, a temporal one, *i.e.,* when was the evidence discovered?, and a predictive one, *i.e.,* when should or could it have been discovered? It is to the latter that the requirement of "due diligence" has relevance. Although a critical concept in "newly discovered evidence" jurisprudence, we have yet to define it in that context or, for that matter, in any other Rule using that term, *i.e.,* Maryland Rule 2–535(c) [12]; Maryland Rule 3–535(c) [13].

The Court has provided guidance as to its meaning, however. Addressing the timeliness of probation revocation proceedings, this Court has equated "due diligence" with "reasonable promptness so as to avoid prejudice to the defendant" and "reasonableness." *State v. Berry,* 287 Md. 491, 500, 413 A.2d 557, 562–563 (1980). *See, State v. Miller,* 289 Md. 443,

---

**12.** "(c) Newly-discovered evidence.-On motion of any party filed within 30 days after entry of judgment, the court may grant a new trial on the ground of newly-discovered evidence that could not have been discovered by due diligence in time to move for a new trial pursuant to Rule 2–533."

**13.** "(c) Newly-discovered evidence.-On motion of any party filed within 30 days after entry of judgment, the court may grant a new trial on the ground of newly-discovered evidence that could not have been discovered by due diligence in time to move for a new trial pursuant to Rule 3–533."

445, 424 A.2d 1109, 1111 (1981); *Clipper v. State*, 295 Md. 303, 312, 455 A.2d 973, 978 (1983). Similarly, our predecessors defined "forthwith," as used in the notice requirement of an insurance policy, to mean "with due diligence, or without unnecessary procrastination or delay, under all the circumstances of the case." *Edwards v. Baltimore Fire Ins. Co.*, 3 Gill 176, 188 (1845). *See Ervin v. Beland*, 251 Md. 612, 617, 248 A.2d 336, 339–340 (1968). Maryland Rule 2–415(i), pertaining to motions to suppress in the deposition context, is consistent, as it requires such motions to be made "promptly after the defect is or with due diligence might have been ascertained." So, too, is the discovery rule, *see Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), pursuant to which the statute of limitations is activated based on actual knowledge, that is, express cognition, or awareness implied from

"knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.... In other words, a [person] cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect."

*Id.* at 636, 431 A.2d at 680, quoting *Fertitta v. Bay Shore Dev. Corp.*, 252 Md. 393, 402, 250 A.2d 69, 75 (1969), in turn quoting *Blondell v. Turover*, 195 Md. 251, 257, 72 A.2d 697, 699 (1950) (citations omitted).

There is also guidance to be gained from the use of the term "due diligence" by the Legislature in other contexts. *See, e.g.,* Maryland Code (1975, 1990 Replacement Volume) § 1–201(27) of the Commercial Law Article;[14] Maryland Code (1995, 1997

---

**14.** Maryland Code (1975, 1990 Replacement Volume) § 1–201(27) of the Commercial Law Article provides:

"(27) Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that

Replacement Volume) § 6–108 of the Insurance Article; [15] Maryland Code (1957, 1997 Replacement Volume) Art. 29 § 18–104.3(d)(3); [16] Maryland Code (1991) § 9–313(d) of the Labor and Employment Article. [17]

■ From the foregoing, it is clear that the concept of "due diligence" has both a time component and a good faith compo-

---

transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information."

**15.** That section provides:
"(c) Payment due in immediately available funds.

(1) Subject to paragraph (2) of this subsection, if an insurer that is required under § 2–113 of this article to pay a premium tax on or before the due date in immediately available funds fails to do so, the Commissioner shall assess a penalty and interest as provided in subsection (a) of this section on the unpaid tax from the date the tax is due to the date on which the funds from the tax payment become available to the State.

(2) The Commissioner may waive the penalty and interest on late payments under this subsection if the insurer proves that it:

(i) made a good faith effort to comply with the requirements of § 2–113 of this article; and

(ii) exercised due diligence to initiate payment correctly and on a timely basis."

**16.** That section provides:
"If the WSSC is unable with due diligence to effect service of process under paragraph (1) of this subsection, a complaint or order shall be served by publication reasonably tailored to provide actual notice to the person to whom the complaint or order is directed."

**17.** Pursuant to that section,
"If the Commission determines that, after due diligence an insurer, including the Injured Workers' Insurance Fund, or a self-insurer is unable to timely submit the report required under subsection (b) of this section, the Commission may:

(1) waive the fine specified under subsection (c) of this section; and

(2) grant the insurer or self-insurer the additional time that may be necessary."

nent; the movant for a new trial must not only act in a timely fashion in gathering evidence in support of the motion, but he or she must act reasonably and in good faith as well. Thus, we believe that, as used in Maryland Rule 4–331(c), "due diligence" contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her.

### III

As we have seen, the trial court denied the motion for new trial. It accepted the testimony authenticating the Benner signatures and the circumstances under which they were given and the expert testimony indicating that it was Benner that signed the Taylor Rental agreement. It also accepted Benner's confession as evidence and expressed the belief that, if Benner were to have been called to testify consistent with it, the result of the trial "may well [have produced] a verdict of acquittal, as opposed to a verdict of guilty that occurred in this case." The court thus determined the evidence to be material and would have the requisite effect on the result. It did not believe, however, that the proffered evidence was newly discovered, that "the petitioner learned of the identity of [Benner] ... after the trial of the case." The court does not explain or give any reasons for its disbelief; it simply says that the burden is on the petitioner to prove that the evidence offered is, in fact, newly discovered and that he has not carried that burden.

The petitioner argues that the State presented no evidence at the hearing on the new trial motion, or at any other time to suggest, not to mention, establish, that he could have discovered Benner, or obtained Benner's statement any earlier than he did. Moreover, pointing to the trial court's finding with respect to the possibility that a different result would have been produced, the State's response to his motion for reconsideration, i.e., " The State agrees that statements elicited at different times from Mr. Benner by both counsel and this writer, if presented to a jury might produce a different verdict," and the comparison of Benner's handwriting exemp-

lar to that contained on the Taylor Rental contract, the petitioner asserts:

> *"there is no dispute as to the credibility, admissibility, scope, persuasiveness, weight, materiality, or effect of this evidence.* The evidence therefore confirms the fact that [the petitioner] *did not commit this crime."* (Emphasis in original.)

He urges this Court to reverse the judgments below and, thus, prevent the incarceration of a person who did not commit the crime for which he has been convicted.

The State argues that affirmance of the trial court's judgment is the proper result consistent with Maryland rule 4–331(c). It contends that:

> "[T]o afford [the petitioner] a new trial would render nugatory the requirement that evidence be newly discovered in order to qualify as a basis for relief under Maryland Rule 4–331(c) and abolish the fundamental principles that the assessment of the credibility of such evidence is the role of the fact finder, not the appellate courts."

Benner did not appear, as we have seen, at the second motion's hearing and, so, his confession was before the court only in the form of a notarized statement and an audio-taped statement. And, judging from the court's comments concerning the effect that Benner testifying at trial would have on the outcome of the trial, it may be inferred that the court did not find the entire confession incredible. Indeed, the comments concerning the similarity of the signature on the Taylor Rental agreement and the exemplars given the petitioner's counsel would suggest that it believed that Benner signed the rental agreement. Thus, it would appear that Benner's credibility was not the decisive factor in the court's denial of the petitioner's new trial motion. Rather, it clearly seems to be that the court distrusted the circumstances surrounding the confession; it found the timing of it untrustworthy and suspicious. While the confession may have largely been true, the court was not satisfied that, viewed from the perspective of Rule 4–331(c), it was timely. In short, the court focused not on the credibility of the confession in all of its details; it was, instead, focused

on the trustworthiness of the totality of the circumstances giving rise to the confession. In so doing, the court did not abuse its discretion.

To be sure, the credibility determinations of the trial court in this case are important. It is obvious that, in reaching its threshold determination, the court believed the witnesses for the state. Indeed, it was that testimony which, it must be inferred, caused the court to distrust the timing and circumstances of the confession. The testimony of the Mall security officer permitted the court to conclude that the petitioner knew, and was in cahoots with, Benner and Seekford and, in fact, that it was the petitioner who was supposed to pick them up, as he did.

Sappington's testimony provided the basis for the court to infer that the petitioner did not act with due diligence or in good faith. It also may have provided an explanation of why the petitioner, though a part of the conspiracy, would report a car-jacking. Notwithstanding his having reported the alleged car-jacking, his subsequent refusal to cooperate was, to say the least, suspicious. And the petitioner's uncooperativeness takes on an even more ominous aspect, and becomes quite understandable, once it is learned that the petitioner has been identified as one of the principals in the Taylor Rental theft. The court could, and obviously did, believe that it was unnecessary for the petitioner to act with due diligence, or in good faith, to locate the person who signed the Taylor Rental agreement because he did not have to; he already, and always, knew who it was—he was his confederate. Moreover, the court was aware, from the petitioner's trial, that three men were involved in the Taylor Rental theft and it could have inferred, from the security officer's testimony, that there were three involved in the Mall incident as well. In any event, the court believed quite clearly that the petitioner and Benner were both involved in the two incidents. Its conclusion that the petitioner did not learn of Benner's identity after the trial of the case can be explained only in that way.[18]

---

18. Benner stated in both statements that he did not know the petitioner, had never seen him before the Marley Mall incident, and had not

The cases that have addressed this issue have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it. When the evidence is offered and the circumstances surrounding it are matters that have been found to inform the former inquiry. In *United States v. Oliver*, 683 F.2d 224 (7th Cir.1982), a letter exculpating the defendant was offered in support of the defendant's motion for new trial. In denying the motion, the court noted "[s]erious questions concerning trustworthiness and motive" surrounding the letter, that the letter was not sent until after trial, and that the author was the defendant's friend and a felon, concluding that an "aura of suspicion and doubt engulfed" the evidence. *See Taul v. State*, 862 P.2d 649, 659 (Wy.1993) (credibility of new evidence); *Horton v. State*, 249 Ga. 871, 295 S.E.2d 281, 287–88 (1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 837, 74 L.Ed.2d 1030 (1983) (same); *State v. Noble*, 591 S.W.2d 201, 206 (Mo.Ct.App.1979) (credibility of confession); *State v. Jager*, 91 N.W.2d 337, 339–41 (N.D.1958) (time and circumstances of the affidavit of confession); *United States v. Roulette*, 75 F.3d 418, 425 (8th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 147, 136 L.Ed.2d 93 (1996) (newly discovered evidence lacked credibility); *United States v. Pierce*, 62 F.3d 818, 824–25 (6th Cir.1995), 516 U.S. 1136, 116 S.Ct. 965, 133 L.Ed.2d 886 (1996) (trustworthiness of newly discovered evidence—"evasive, inconsistent, and implausible"); *United States v. Steel*, 458 F.2d 1164, 1166 (10th Cir.1972) (credibility of the newly discovered evidence); *United States v. Miller*, 277 F.Supp. 200, 209 (D.Conn.1967), appeal dismissed, 411 F.2d 825 (2nd Cir.1969) (circumstances surrounding the proffered confession).

 The petitioner's contention that the State failed to produce any basis for challenging, not to mention discrediting, the evidence he produced in support of his motion for new

---

spoken to him since. Certainly, the trial court did not credit that part of Benner's affidavit or statement.

trial must be rejected. As we have seen, the State produced two witnesses, whose testimony the court obviously credited. Because their testimony was not at all consistent with Benner's confession and, in fact, if believed, substantially undermined it, it follows that not only did the State challenge the confession, but that challenge was sufficient to convince the court that Benner's confession was not newly discovered evidence. As the proponent of the new trial motion, the petitioner had the burden of establishing, among other things, that the confession was newly discovered evidence. The petitioner simply failed to carry it. Accordingly, the trial court did not abuse its discretion when it denied the petitioner's motion for new trial.

JUDGMENT AFFIRMED, WITH COSTS.

ELDRIDGE, J., joins in the result only.