Circuit Court for Talbot County
Case No. 20-K-00-6884

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 1069 & 1879

September Term, 2016

_____

JONATHAN D. SMITH

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Reed,

JJ.
_____

Opinion by Graeff, J.
_____

Filed: July 26, 2017

\* Judge Christopher B. Kehoe did not participate, pursuant to Md. Rule 8-605.1, in the Court's decision to report this opinion.

On January 5, 1987, 64-year-old Adeline Wilford was stabbed to death in the kitchen of her farmhouse. The investigation stalled for years, but on March 1, 2001, a jury in the Circuit Court for Talbot County convicted Jonathan D. Smith, appellant, of felony murder and daytime housebreaking. The circuit court subsequently sentenced him to life imprisonment.[1]

Approximately 10 years later, after appellant's effort to reverse his convictions by appeal and post-conviction relief were unsuccessful, the Innocence Project in New York filed Maryland Public Information Act ("MPIA") requests regarding this case. Based on information received from those requests, appellant filed a Petition for Writ of Actual Innocence and a Motion to Reopen Post-Conviction Proceedings.[2] The circuit court denied both the petition and the motion.

On appeal, appellant presents several questions[3] for this Court's review, which we have consolidated and rephrased, as follows:

---

[1] Two others were implicated in the murder. David Faulkner was tried separately, and he was convicted of murder. Ray Andrews was found guilty, pursuant to a plea, of involuntary manslaughter.

[2] Appellant referred to his petition as an "application," but the circuit court referred to this pleading as a "petition," and we shall do the same.

[3] Appellant's original questions presented were as follows:

1. Did the circuit court err in finding that Mr. Smith's evidence of innocence was not newly discovered?

2. Did the circuit court err in finding that the newly discovered evidence did not demonstrate a substantial or significant possibility of a different result?

1. Did the circuit court abuse its discretion in denying appellant's Petition for Writ of Actual Innocence?

2. Did the circuit court abuse its discretion in denying appellant's Motion to Reopen Post-Conviction Proceedings?

For the reasons set forth below, we shall vacate the judgments of the circuit court and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.**

**The Murder of Adeline Wilford**

On January 5, 1987, at approximately 3:00 p.m., Jack Ripley, Ms. Wilford's friend, discovered Ms. Wilford's body in her kitchen and called the police. Ms. Wilford had been photographed by her bank's security system driving her car through the bank drive-through that day at 2:10 p.m., and therefore, the murder appeared to have been committed at some point in the 50-minute period of time between when she left the bank and when her body was found.

Maryland State Police ("MSP") officers responded to the scene shortly after the call. A window on the west side of the house was propped open with a stick. The police believed that entry to the home had been made through that window, which led to a utility room.

---

3. Did the circuit court err in failing to reopen Mr. Smith's postconviction proceedings in the interests of justice?

4. Did the circuit court err in failing to vacate Mr. Smith's convictions due to multiple *Brady* violations and his counsel's ineffective assistance?

When the police entered the house, they saw that the keys to the house were still in the door lock, and Ms. Wilford was lying face up on the floor. She was wearing a blue coat, and she had a set of glasses on a cord around her neck. There were numerous stab wounds to her hands and face, and a large butcher knife with an eight-inch blade was "shoved right through the side of [her] cheek and head." There were groceries on the kitchen table that had not been taken out of the bag, which suggested that she had surprised someone in the house.

The officers performed a sweep of the house to ensure that no one else was inside. Items inside the home seemed "out of place," and dressers were opened with "stuff taken out," which suggested that "someone had broken into the house and was looking for money or other goods." The police lifted fingerprints and palm prints from various places in the house, including the outside of the utility room window and the washing machine in the utility room.

A number of items were missing from Ms. Wilford's residence, including the tan pocketbook that Ms. Wilford was seen carrying that day, Ms. Wilford's custom-made diamond and sapphire ring, and her wallet containing credit cards and an undetermined amount of cash. The police did not recover any of these items.

## II.

### Subsequent Investigations

After a number of years passed and the murder investigation had stalled, the victim's son, Charles Curry Wilford, encouraged the police to reopen the investigation. He offered

-3-

a reward of $10,000 for information leading to the arrest of the perpetrator(s) and an additional $15,000 if there was a conviction.

Sergeant John Bollinger met with Beverly Haddaway on January 14, 2000, and she told him that her nephew, appellant, and two others had committed the crime. Ms. Haddaway stated that, approximately two years after the incident, appellant confessed to her that he had killed Ms. Wilford.

Ms. Haddaway agreed to wear a "wire" and surreptitiously record appellant. On April 11, 2000, she recorded a conversation with appellant that occurred in a shed behind her house. During that conversation, Ms. Haddaway asked appellant about the day she saw him on "Kingston Road when that old woman got murdered and you told me the dog bit ya and you stabbed it." She asked who killed the woman. After appellant initially stated, while laughing, that he did not know,[4] the following occurred:

> [BH:]  Why were you in that field with blood all over ya? And they take, I seen ya goin' up the road that day, you know it? And you had a blue coat on and Ray [Andrews] and you both had huntin' hats on. And then when I come back by there and you were in that cornfield and you said that blood come off a dog, but I think that you held her and David [Faulkner] killed her or one of you three done it.
>
> [JS:]  They never found out yet have they?
>
> [BH:]  I know, that's why I want to know 'fore I die. I seen ya, did I ever tell anybody? You know I ain't gonna tell on ya, goddamn, you're my blood. I just wanted to know if you done it. I didn't really think you did. I think crazy David did.
>
> [JS:]  It's a secret. It's a secret when one person knows[.] It aint [sic] a secret when two people know.

_____

[4] Beverly Haddaway mentioned twice that appellant was laughing.

-4-

[BH:]     Well, the three of you know.

[JS:]     Right, there's only two left.

[BH:]     It was you and Ray and David.

[JS:]     Ray wasn't there until after it was over.

[BH:]     Where was he?

[JS:]     Down the road.

[BH:]     Ray was right with you in the goddamn field.

[JS:]     Yeah.  That was after it was all done with.

Ms. Haddaway asked again who killed the victim.  When appellant responded that he could not remember, Ms. Haddaway stated:  "Jonathan, you're lying 'cause you're laughing."  The conversation continued, as follows:

[BH:]     Well why do you think I would tell anybody.  I ain't told nobody in 12 goddamn years.  I just wanted to know.

[JS:]     (Inaudible) she had money.

[BH:]     Huh?

[JS:]     She had money.

[BH:]     She had money?

[JS:]     Uh huh.

* * *

[BH:]     [Dick] said that he'd heard three or four times that you had tried to get somebody to . . . .  But, ah . . . .

[JS:]     It's been a long time.  I don't even remember it no more.

[BH:]     Oh.  You know whether you done it or David done it if Ray weren't there.  I'll tell ya reason I ask. . . .  [T]his lady that lived over Ridgley . . . .  told me that David's foster mother had something and . . . the old woman said that they had bought David

-5-

out of a murder. And I was wondering, you know, if she knew anything or did she tell you, I just wondered if he did it or you. Tell me. I ain't gonna tell nobody, I just want to know (inaudible).

[JS:]      He didn't do it.

[BH:]      You done it.

[JS:]      Uh huh.

[BH:]      You said you did it before. Why did you kill her? I thought she let you in there when you went fishin'[.] . . . What, you didn't know her?

[JS:]      I knew she had money.

[BH:]      You knew she had money.

[JS:]      She had money.

[BH:]      But you didn't get none?

[JS:]      Uh huh.

[BH:]      You did get it.

[JS:]      Uh huh.

Appellant then stated that the men got $60,000, and they split it three ways.

In response to Ms. Haddaway's question regarding why Mr. Faulkner had appellant's coat, appellant said that Mr. Faulkner "got cut" and had too much blood on his coat, so he got rid of it. Appellant then stated that both he and Mr. Faulkner had stabbed the victim, and the conversation continued as follows:

[BH:]      [T]hat day you told me I thought no, he ain't done it, that stupid David if he, anybody done it.

[JS:]      If there's enough money I'll do it.

[BH:]      Enough money. Well, it's alright if you don't get caught.

[JS:]      I won't get caught.

On April 25, 2000, the police brought appellant, Mr. Faulkner, and Mr. Andrews to the Easton MSP barrack for questioning. Appellant was advised of his rights, and although he initially "almost seemed happy to be answering [their] questions," his demeanor changed when Sergeant Jack McCauley asked if appellant and Mr. Faulkner had been involved in any criminal activity together. At that point, appellant "became somewhat withdrawn, dropped his head . . . . [a]nd he became very evasive, fidgety in his seat." Appellant denied any involvement with the murder of a woman. He acknowledged his conversation with Ms. Haddaway, but he claimed that he admitted involvement in the murder because he wanted Ms. Haddaway to think that he was a tough person.[5]

Sergeant Bollinger and another officer interviewed appellant again later that day. Sergeant Bollinger advised appellant of his *Miranda* rights, giving him a copy of the form to "follow along as [Sergeant Bollinger] was reading it to him." Before Sergeant Bollinger asked any questions, appellant volunteered his narrative of what had happened, and Sergeant Bollinger listened for several minutes without interrupting. Appellant stated that "he, David Faulkner, [and] Ray Andrews, had gone to the residence," and "he and David Faulkner broke into the residence," but Mr. Andrews stayed outside. While appellant and Mr. Faulkner were in the house, Ms. Wilford returned, and when appellant

---

[5] Sergeant Jack McCauley testified that he was aware that appellant had a hearing impairment. Whenever appellant did not understand what he was saying, Sergeant McCauley would determine whether it was because he did not hear the question or "simply did not understand the question," and he would then repeat or rephrase the question.

"noticed her she was standing in front of him screaming and . . . David Faulkner was stabbing her." Appellant stated that Ms. Wilford was wearing a blue coat and had glasses on a chain around her neck, and "she was fighting and moving her arms about." As Mr. Faulkner was stabbing Ms. Wilford, she fell back on appellant, getting blood on his shirt. Sergeant Bollinger then asked appellant if he had stabbed Ms. Wilford, and at that point, appellant asked for an attorney.

Mr. Andrews also talked to the police. He told Sergeant Joseph Gamble that appellant and Mr. Faulkner discussed burglarizing Ms. Wilford's house, but he did not want to, so they told him to stay in the wooded area. Approximately 20 minutes after appellant and Mr. Faulkner approached the house, Mr. Andrews saw a vehicle pull up the Wilford driveway. A few minutes later, appellant and Mr. Faulkner ran from the house. Appellant had blood on his shirt. The three men then ran through woods and fields until they reached Black Dog Alley, where they saw Ms. Haddaway driving down the road. Ms. Haddaway asked appellant why he had blood on his shirt, and appellant replied that he had been attacked by a dog. The three men then went to appellant's house, where appellant changed his clothes.[6] Appellant and Mr. Faulkner removed money from their pockets and divided it up. The next day, appellant told him that the woman at the house was dead, and Mr. Andrews should never tell anybody about it.

---

[6] Mr. Andrews initially stated that they did not get a ride to appellant's house. When Sergeant Joseph Gamble asked if there was a possibility that they got a ride, Mr. Andrews said that he did not think so, but he was not sure because that part of the day was not clear in his mind.

**III.**

**Appellant's Trial**

Appellant's four-day trial began on February 26, 2001. In addition to the evidence discussed, *supra*, Alexander Mankevich, a fingerprint expert for the Maryland State Police Crime Laboratory, testified that he did not match any fingerprints left at the scene to any known suspects. He further explained how a fingerprint typically is left on a surface, why fingerprints might not be located, and the inability to determine the length of time a fingerprint has been on any surface. Sergeant Bollinger testified that, although fingerprint, DNA, and hair samples were taken from appellant, those samples did not match any of the evidence the police had collected from the crime scene.

Ms. Haddaway testified that, on January 5, 1987, she was driving on Black Dog Alley and saw her nephew, appellant, emerge from a cornfield with Mr. Faulkner and Mr. Andrews.[7] She pulled over to the side of the road, and appellant approached her truck. His glasses were broken and repaired with tape or a bandaid, and he was wearing a white t-shirt that had "red dots" around the collar. Ms. Haddaway asked him what he was doing there.[8] Appellant stated that he was waiting for somebody, and he thought that person was in the truck Ms. Haddaway was driving. When asked again what the men were doing,

---

[7] Sergeant Gamble testified that Ms. Wilford's house was approximately 1.5 to 2 miles from Black Dog Alley.

[8] Ms. Haddaway was aware that appellant had a hearing impairment, so she mouthed her words slowly so he could read her lips. When appellant could not understand what she was saying, he would "go uh-huh or what," and Ms. Haddaway would repeat what she had said.

appellant said that he had just killed a dog. Ms. Haddaway called appellant a liar. Appellant started laughing and stated: "Yes I did. I killed him cause [sic] it bit me." He told her that he had stabbed the dog. Another truck then pulled up behind Ms. Haddaway, and the three men got into the truck. As Ms. Haddaway drove away, she saw a number of police vehicles and an ambulance driving fast on Black Dog Alley and then turning left onto Kingston Road.

Mr. Andrews testified, consistent with his statement to the police, that he waited in a wooded area while appellant and Mr. Faulkner went to Ms. Wilford's house, and after they came running back, the three men ran until they arrived at Black Dog Alley and saw Ms. Haddaway in her vehicle.[9] Ms. Haddaway asked appellant what happened to him, and appellant responded that he had been attacked by a dog. Mr. Andrews believed that someone was with Ms. Haddaway that day, but he was "not sure if it was a man or not." The three then went to appellant's house.[10] Appellant and Mr. Faulkner did not talk about what happened, but they pulled out of their pockets a large quantity of cash, approximately $300 to $400. Mr. Andrews did not get any of the money. Appellant and Mr. Faulkner never talked to him about what occurred that afternoon. When Mr. Andrews saw a report in a newspaper the next day, appellant and Mr. Faulkner told him "to keep quiet."

---

[9] Mr. Andrews testified that he was appellant's brother-in-law; they "married two sisters."

[10] Mr. Andrews testified that he told the police that they walked to appellant's house. He subsequently testified, however, that he told the police that he did not recall if he got a ride that day.

On cross-examination, Mr. Andrews acknowledged that, in exchange for his testimony against appellant and his agreement to enter an *Alford* plea to the crime of involuntary manslaughter for his role in Ms. Wilford's murder, the prosecutor would recommend that he be sentenced to five years.[11] Mr. Andrews testified, however, that he had not been promised any financial reward or incentive to testify.

Michael Snow, a former Baltimore City police officer who had been convicted of bank robbery, testified that he was housed with appellant in the same protective custody ward at the Talbot County Detention Center. At one point during their detention, he asked appellant if he really killed "that lady."[12] Appellant "just looked at [him] and said uh-hum." When Mr. Snow asked how appellant killed her, appellant "had his hand kind of just folded like if he was holding something," and he made stabbing motions. When Mr. Snow asked appellant why he killed the woman, appellant stated that "she was an old lady" who "startled him when she came in." Appellant explained that "he was fighting with her trying to get away" when "she bit him," and he then "went crazy."

---

[11] "An *Alford* plea . . . lies somewhere between a plea of guilty and a plea of *nolo contendere*. Drawing its name from *North Carolina v. Alford*, 400 U.S. 25 (1970), such a plea is a guilty plea containing a protestation of innocence." *Bishop v. State*, 417 Md. 1, 19 (2010) (citations and quotation marks omitted).

[12] Michael Snow testified that, at the time, he was aware that appellant was charged with murdering Ms. Wilford, noting that it was "pretty much common knowledge in the facility on who's charged with what," and he had read articles about the crime and "the substance of a tape recorded . . . conversation" that appellant was trying to exclude from his trial.

Mr. Snow testified that he did not receive a plea deal or anything else in exchange for his testimony. He stated that he testified against the advice of his attorney because he found what appellant said to him "appalling."

After the State concluded its case-in-chief, the defense recalled Ms. Haddaway. Defense counsel questioned her about inconsistencies between her testimony and the police report of her conversation with Sergeant Bollinger on January 17, 2000. Ms. Haddaway stated that a "lot of things that they wrote down [were] wrong."[13]

Ms. Haddaway acknowledged that she had visited Mr. Andrews in jail. There were occasions that Mr. Andrews' lawyer was present when she went to visit him.

Ms. Haddaway also testified that she received a $10,000 deposit on a $25,000 reward for providing information that led to an arrest. The police told her that, to get the $25,000 reward, all she had to do was testify, which she agreed to do "as long as [she could] tell the truth and only the truth."

On the last day of trial, appellant testified. He recalled his April 11, 2000, recorded conversation with Ms. Haddaway, but he stated that the "whole time [he] did not ever know what she was saying, referring to or what she was talking about or nothing." He denied admitting to Ms. Haddaway that he killed Ms. Wilford. Although he did tell her that "all

_____

[13] Ms. Haddaway did acknowledge that her statement to the police that she drove to Glen Burnie on January 5, 1987, to pick up an insurance check, and she was driving down Black Dog Alley with Thomas Marshall, was incorrect. She testified that she subsequently realized that she actually had gone to Chestertown that day with Susan Fitzhugh, and they had stopped off at Ms. Fitzhugh's mother's house, who lived in Black Dog Trailer Park nearby.

three got the money," and they "all split $20,000 apiece," that statement was not true. He testified that he lied to Ms. Haddaway because she kept asking him questions "about something that happened that I had no knowledge [of]" and "that was the only way [he] could think of to get her to leave [him] alone."

Appellant also testified about his interview with Sergeant Bollinger. He stated that he could not hear the recording Sergeant Bollinger tried to play for him. Sergeant Bollinger then advised that if he did not "come clean you'll never, ever see your wife or your kids again." At that point, and because Sergeant McCauley told him that he would see appellant "strapped down and [given] lethal injection," he told Sergeant Bollinger that he "did it, David did it. Ray was there. I didn't know what else to do."

Appellant acknowledged that he was placed in protective custody with Mr. Snow. He denied, however, that he told Mr. Snow that he killed Ms. Wilford or that he made "stabbing motions" with his hand.

Appellant denied taking part in Ms. Wilford's murder. He testified that he was not with Mr. Faulkner and Mr. Andrews at the time because he "did not know neither of the (inaudible) at all, neither one." He also denied seeing Ms. Haddaway on Black Dog Alley that day.

Sergeant McCauley was recalled as a rebuttal witness for the State. He testified that he had reviewed various newspaper articles from 1987 through 1999, and none of the articles that he reviewed contained a description of what Ms. Wilford was wearing when she was killed.

As indicated, on March 1, 2001, a jury found appellant guilty of felony murder and daytime house breaking.

## IV.

### Subsequent Procedural History

On March 13, 2001, appellant filed a motion for new trial, arguing that "exculpatory DNA evidence was withheld from the defense," specifically that DNA analysis of debris taken from under the victim's fingernails was not a match for appellant or Mr. Faulkner. The circuit court denied the motion.

On appeal, this Court rejected appellant's claims of error during the trial, but we concluded that the circuit court erred in denying appellant's motion for a new trial without a hearing, and therefore, we remanded for a hearing on the motion. *Smith v. State*, No. 688, Sept. Term, 2001 (filed Jan. 17, 2002). The Court of Appeals subsequently affirmed. *Smith v. State*, 371 Md. 496 (2002).

On remand, defense counsel abandoned the argument regarding the withheld DNA evidence, and instead argued that appellant had been "set up" by Ms. Haddaway and Mr. Andrews. Defense counsel argued that, Mr. Andrews' attorney, Grayson Eckel, had a conflict of interest because he represented: (1) Mr. Andrews in the criminal case regarding Ms. Wilford's murder; (2) Lacy Janda, Ms. Haddaway's daughter, in an estate matter addressing whether appellant or Ms. Janda would inherit appellant's father's property; and (3) Ms. Haddaway in a civil suit against Ms. Wilford's son, regarding the reward money. The circuit court denied the motion, stating that the argument that the dual representation

-14-

suggested that Mr. Eckel exercised any influence against Mr. Andrews on behalf of Ms. Haddaway was "conjecture."  This Court affirmed.  *Smith v. State*, No. 1184, Sept. Term, 2003, slip op. at 7-8 (filed Nov. 4, 2004).

On September 28, 2005, appellant, an unrepresented litigant, filed a Petition for Post Conviction Relief.  On April 13, 2009, the circuit court denied his petition, and this Court subsequently denied his application for leave to appeal.  *Smith v. State*, No. 850, Sept. Term, 2009 (filed June 9, 2010).  On December 27, 2011, appellant, again unrepresented, filed a motion to reopen post-conviction proceedings, which the court subsequently denied.

## V.

### Petition for Writ of Actual Innocence and Motion to Reopen

In 2011, the New York Innocence Project filed MPIA requests on behalf of appellant.[14]  A paralegal with the Innocence Project visited MSP, and she observed a number of "tape cassettes" in the boxes of evidence.  Upon request, and after other legal maneuvers, MSP produced copies of the tapes, which contained several recorded conversations between Sergeant Bollinger and Ms. Haddaway ("the Bollinger-Haddaway tapes").

On August 2, 2013, appellant filed a Motion to Reopen Postconviction Proceeding, arguing that, "based on newly-discovered and otherwise-suppressed evidence," "the State violated his Due Process rights by withholding exculpatory evidence and affirmatively

---

[14] In 2012, the Mid-Atlantic Innocence Project filed a Public Information Act request on behalf of Mr. Faulkner.

misleading both [appellant's] prior counsel and the jury on material issues in the case." Specifically, he pointed to his discovery of the Bollinger-Haddaway tapes, and the State's alleged wrongful withholding of "DNA test results showing a foreign profile on the victim's fingernails from which all defendants were excluded." He asserted that these violations, in addition to ineffective assistance of counsel, warranted reopening his case.

As explained in more detail, *infra*, Mr. Mankevich subsequently entered the unidentified palm prints from Ms. Wilford's residence into the Maryland Automated Fingerprint Identification System ("MAFIS" or "AFIS"). He determined that Tyrone Anthony Brooks ("Ty Brooks") was the source of the palm prints found on Ms. Wilford's washing machine and on the outside of the utility room window.[15]

On June 11, 2015, appellant filed a petition for writ of actual innocence. In his petition, and at the subsequent hearing, he asserted three claims of newly discovered evidence: (1) the identification of Ty Brooks as the source of the palm prints; (2) the recorded conversations between Ms. Haddaway and Sergeant Bollinger; and (3) statements by an eyewitness that he saw a vehicle at Ms. Wilford's house at approximately 2:00 p.m. on the day of the murder.

---

[15] Appellant subsequently filed a supplement to his motion to reopen post-conviction, raising two new categories of alleged newly discovered evidence: (1) a "database comparison [which] resulted in the identification of Ty Brooks as the source of palm prints at the point of entry to the crime scene"; and (2) "recently disclosed files from the Maryland State Police ("MSP") that contain additional exculpatory tape recorded statements by Beverly Haddaway as well as other documents that further undermine Haddaway's credibility."

The circuit court consolidated the hearings on appellant's and Mr. Faulkner's petitions and motions. The court issued an order detailing the order of presentation, which stated as follows:

I. Opening Statements limited to the Petitions for Writs of Actual Innocence;

II. Presentation of evidence in support and rebuttal of Petitions for Writs of Actual Innocence;

III. Closing Arguments limited to the Petitions for Writs of Actual Innocence;

IV. Ruling by the Court on the Petitions for Writs of Actual Innocence (or announcement that decision will be taken under advisement);

V. If the Court does not grant or defers ruling on the Petitions for Writs of Actual Innocence and provided there is time remaining, the Court will entertain proceedings regarding Petitioners' Motions to Reopen their prospective Post-Conviction Petitions starting with opening statements;

VI. Presentation of evidence/information in support of rebuttal of Motion to Reopen Post Conviction Proceedings[; and]

VII. Closing Arguments limited to the Motion to Reopen Post Conviction Proceedings.

A seven-day evidentiary hearing began on April 11, 2016. We will discuss the evidence as it relates to the various claims raised by appellant.

**A.**

**The Utility Room Palm Prints**

Mr. Mankevich testified that, after the police discovered the palm prints on the outside of the utility room window and on the washing machine at Ms. Wilford's residence, the local MSP implemented a policy, in several jurisdictions, of collecting palm prints from

-17-

all arrestees, on the chance that, if the perpetrators were engaging in a pattern of burglaries, they might return to the area and commit more offenses.[16] From 1987 to 2000, Mr. Mankevich performed 72 manual comparisons of the prints lifted from Ms. Wilford's residence.

In October 2008, the State's vendor for the MAFIS system "went online" with the ability to perform electronic fingerprint searches, and in 2009, the vendor added the ability to perform electronic palm print searches. The system uses an algorithm that performs a "statistical analysis of the minutia[e]" and creates a score for possible candidates, which are then listed and ranked by the closeness of the match. Mr. Mankevich explained that, before the MSP Crime Laboratory gained access to MAFIS, there was "no systematic way to follow through" with an unidentified print. "So if a print was unidentified at that time it would remain sealed as evidence until another name got forwarded. There was no follow through with it."

In August 2013, appellant and Mr. Faulkner filed a motion for post-conviction comparison of latent fingerprints, requesting that the court order the State to enter the unidentified latent palm prints found at the crime scene into the MAFIS database to determine whether an unknown suspect could be identified. The State opposed this motion, stating that appellant failed to cite any authority that gave the court the power to order the State to provide such testing.

---

[16] Corporal Roger Layton explained that the MSP directed the agencies in Dorchester, Talbot, and Caroline counties to collect palm prints after every arrest, but he was not sure whether the policy "included Centreville and Kent County."

-18-

On October 16, 2013, however, the Office of the State's Attorney for Talbot County, prior to a ruling by the court, contacted Mr. Mankevich and asked him to run the palm prints lifted from the crime scene through the MAFIS database. He retrieved the lift cards from the Hall of Records and personally put them into the MAFIS system. After receiving the computer generated list of potential matches, Mr. Mankevich compared Ty Brooks' known prints to the palm print taken from Ms. Wilford's washing machine and the palm print taken from the bottom pane of the "point of entry" utility room window. He concluded that Ty Brooks was the source of those prints.[17]

On March 22, 2016, Mr. Mankevich received a request from appellant's defense counsel to compare the remaining prints with known samples from William ("Boozie") Clarence Thomas. Of the eight remaining "unidentified latent print impressions," Mr. Mankevich eliminated Mr. Thomas as the source for seven of the prints, but he was unable to perform a full comparison of the eighth print, which was taken from the porch door. The methodology used to perform a manual comparison was the same that he used in 2000, i.e., the science had been the same since 1987, and the "development of the AFIS system played no part in [his] ability to examine the prints and [make a] comparison for [Mr.] Thomas."

---

[17] Alexander Mankevich testified that, as a matter of policy, "a manual examination is done that is verified before we report the AFIS match out as an official result." Mr. Mankevich excluded Ty Anthony Brooks as the source of prints from other places in the house.

On cross-examination, Mr. Mankevich testified that "[p]art of the mission of Maryland State Police is to provide forensic services to any legitimate party requesting, whether it's the defense part or the [S]tate." When asked whether he would have compared prints of Mr. Thomas or Ty Brooks to the latent prints recovered if appellant had asked, he responded that he would have if the person requesting had "investigative authority," which could include the Public Defender's Office, private defense attorneys, and the Innocence Project. Mr. Mankevich agreed that, except in cases where he received a match "generated by the AFIS system," all he needed to make a comparison between Ty Brooks' hands and the latent prints was "an inked print" from Ty Brooks' hands and "a request to do so," which could have been initiated by appellant.

With respect to the process of comparing latent print lifts, Mr. Mankevich explained that he looked for "artifacts in the background," such as "scratches, nicks, cuts, those sort of things," which "could be matched from image to image." The State then followed up on Mr. Mankevich's testimony that, with respect to the prints here, he "noticed rain drops or something." Mr. Mankevich stated: "Right, moisture, that would be in the second group of impression[s] so that moisture that gets on the background, whether it's again raindrops or it could be spray from Windex. Some liquid source will leave a distinguishing mark that later gets developed with powder." He explained that in one group of prints, he saw a "U shaped feature in the center," which he believed was "caused by extraneous moisture being present that the powder had adhered to." The following then occurred:

[STATE:] So the existence of raindrops after the print was left?

[MR. MANKEVICH:] Correct.

[STATE:] Which would indicate the print was left before it rained. . . .

[MR. MANKEVICH:] You really can't make that age, timeline association.

[STATE:] Okay, let's talk about that. You can't tell whether it was before it rained or after it rained.

[MR. MANKEVICH:] That's correct.

[STATE:] You couldn't tell how long a print had been there?

[MR. MANKEVICH:] There is no forensic technique to allow you to date a fingerprint.

[STATE:] You cannot testify to a degree of scientific certainty at all about the timing of these prints relative to the date of collection?

[MR. MANKEVICH:] Again we have no reliable consistent validated forensic techniques that can indicate the lifetime of a latent print.

Kate Wilford Carraher and Evelyn Wilford Lippincott, the daughters of Ms. Wilford, testified that, in the months leading up to the murder, the window in the utility room was propped open with "a stick" because there was a "persistent," "God awful" odor that smelled "like a family of dead mice." The window being open was particularly memorable to Ms. Lippincott because Ms. Wilford had the window open "in the middle of the winter," and she gave her mother "a hard time about it."

Mr. Butler, a member of the MSP evidence collection unit, noted that, if the utility room window was opened, the lower portion where a palm print was found would be "pushed up" behind the upper portion, rendering the exterior panes "[i]naccessible to anyone's hand."

# B.

## The Keene Observation

Sergeant Sabrina Metzger testified about a police report, dated June 12, 1987, in which Sergeant James Harmon reported that he was contacted by Daniel ("Danny") O'Neil Keene on January 9, 1987. That police report stated as follows:

> Same date [January 9, 1987,] the writer [Sergeant Harmon] and [Sergeant Samuel] Shelly were contacted at the Easton Barrack by Danny Keene. He reported seeing a silver colored vehicle he believed to be an Olds Cutlass. He was taken to the victim's residence, at which time he showed the writer the location he observed the vehicle parked. The location was backed in next to the front porch, next to several bushes, bearing a similar type leaf as found in the living room floor of the victims [sic] house. He was [driven] around Easton, and upon observing a vehicle at the Bonanza Rest[a]urant, he stated it was a vehicle similar to the one he observed. He had picked out a 77 Olds Cutlass. Refer to [Sgt.] Shelly's supplements for further details of this individuals [sic] interviews.

Mr. Keene's observation also was noted in a case review complied by Sergeant Bollinger.[18] Neither document, however, specifically noted *when* Mr. Keene observed the Oldsmobile Cutlass.

Mr. Keene testified that, in January 1987, he lived in Trappe, Maryland, and he was working as a hunting guide. He rented a farm next to Ms. Wilford's house. He often drove by Ms. Wilford's house, but he did not know her. On the afternoon of January 5, 1987, between approximately 1:50 and 1:55 p.m., he drove past Ms. Wilford's residence. It was sunny, and he looked at Ms. Wilford's property for geese. Although he had driven past

---

[18] Marie Hill, the trial prosecutor, testified that this case review, a binder designated Respondent's Exhibit 7, was disclosed to trial defense counsel.

Ms. Wilford's house multiple times, he had never seen any "signs of life." On that occasion, however, he looked and saw some "clothes on [a] line" next to and behind Ms. Wilford's house, and he thought to himself, "well somebody does live there." After the clothes on the line drew his attention to the property, he began "looking all around." As he reached the point where some "little trees start thinning out," he saw a "jacked up" Oldsmobile Cutlass Supreme "[b]acked up against" Ms. Wilford's house.[19] The car was parked "very close" to the house, "[l]ike it was backed in.

Approximately four days later, Mr. Keene reported his observation to the police. They interviewed him at the Easton barrack and drove him around Easton until he spotted a car "that resembled the one that was parked in the lane."

The police also had Mr. Keene hypnotized on February 9, 1987, in an attempt to develop more information about his observation. A copy of a recording of this hypnosis session, which originally was recorded on Betamax videotapes, was provided to appellant in 2016. During the actual innocence hearing, the beginning of the video was played, in which Sergeant Shelly explained the attempt to get more information regarding Mr. Keene's statement that he saw a vehicle at the residence of Ms. Wilford at approximately 1:55 p.m. on the date of the murder.

---

[19] Corporal Layton similarly noted that there was a line of trees that ran along Kingston Road that ended approximately at the point where Ms. Wilford's driveway connected to the road. Although Danny Keene testified that he saw the Cutlass Supreme once the "little trees start[ed] thinning out," Corporal Layton testified that the line of trees would "interfere with the line of sight" between the road and the front porch of the residence.

Mr. Keene denied asking for any money in exchange for his assistance. He testified that he "[n]ever heard another word" about the murder until years later, when he was approached by appellant's post-conviction counsel.

On cross-examination, the State asked Mr. Keene if George Merritt was with him when he witnessed the car parked at Ms. Wilford's house. He did not "remember anybody being in that truck with [him]" at that time, but when confronted with a recording in which he told the police that Mr. Merritt was with him when he saw the car, Mr. Keene stated: "I guess he was, you know." Mr. Keene stated that, notwithstanding his inability to recall other circumstances, his observation of the Oldsmobile was particularly memorable because that was the first time he had seen a car parked there, and the car had a distinctive appearance, i.e., it was "jacked up. She had chrome wheels. She had whitewalls. Split grill."

## C.

### James Brooks Implicates Others in the Murder

James Brooks, Jr., testified that he grew up in Trappe, Maryland, and he was a longtime friend of Mr. Thomas. At some point around 1991, he contacted MSP and advised that Mr. Thomas had told him that he and Ty Brooks had murdered Ms. Wilford.[20]

---

[20] Sergeant Sabrina Metzger testified that James Brooks was identified in police records as a confidential informant.

James Brooks testified, consistent with his statement to the police, that Mr. Thomas confessed to him in late 1989 or early 1990.[21] Mr. Thomas told him that he had borrowed his uncle's car to get to Ms. Wilford's house, Ms. Wilford "might have wrote [sic] down the tag number" of the car when she came home that day, and Mr. Thomas instructed him not to tell anyone about his confession. When asked if he could recall if Mr. Thomas said where that the victim had been stabbed during the murder, he said "it might have been in the back."

As discussed in more detail, *infra*, the court sustained the State's objection to the question whether Mr. Thomas had named another individual involved in breaking into the house, on the ground that this hearsay statement did not fall within the hearsay exception for a statement against penal interest because the "particular identification of who the accomplice is . . . goes beyond [a] statement against penal interest." James Brooks subsequently testified, without naming the person, that Mr. Thomas told him that he was with another person when Ms. Wilford was murdered. James Brooks stated that he was acquainted with Ty Brooks, and Mr. Thomas and Ty Brooks were brothers-in-law and knew each other in 1987.

Counsel for Mr. Faulkner subsequently moved to admit into evidence James Brooks' written statement to the police. In this statement, he explained that he and

---

[21] Appellant and Mr. Faulkner called Mr. Thomas to testify, but he invoked his Fifth Amendment right against self-incrimination.

Mr. Thomas were on a drinking binge one night, and Mr. Thomas confessed to killing Ms. Wilford, as follows:

> [H]e said that him and a guy named Ty Brooks were in her house stealing and the lady came home early on them[.]  [H]e had borrowed his sister's car [and] she noticed the car parked near her house and wrote the tag # of the car down before she entered the house[.]  [H]e took a butcher knife I believe [and] hid behind the kitchen door[.]  [W]hen she came in he stabbed her to death and left her for dead.

The circuit court admitted the statement, over the State's objection, but it ruled that it would redact two words, i.e., "Ty Brooks," to be "consistent with [its] earlier ruling [on] the identity of any other person."

When counsel for Mr. Faulkner asked James Brooks about his motivation for contacting the police, he testified: "I was strung out on drugs.  I was trying to cash in on the reward."  James Brooks admitted that he previously had been convicted of a number of offenses, including uttering a false document, taking a car without the owner's permission, and various thefts.  When asked whether there was any motivation for him "to be testifying here today other than to tell the truth," James Brooks responded: "Yeah.  I mean I was told to do what was right and turn it over to God."

### D.

### Ty Anthony Brooks and William Clarence Thomas

Appellant introduced evidence of Ty Brooks' extensive criminal history, including breaking and entering and burglary charges in 1986.  The State stipulated that Ty Brooks and Mr. Thomas were not incarcerated in Maryland at the time of Ms. Wilford's murder.

Appellant attempted to call Ty Brooks as a witness and to introduce a portion of Ty Brooks' 2015 recorded interview with the police. In this interview, Ty Brooks admitted that he had committed numerous offenses in Easton, but he did not recall going to Ms. Wilford's house, stating that murder was not his "MO." As explained in more detail, *infra*, the court sustained the State's objection to the admission of this evidence on the ground that Ty Brooks had been convicted of perjury, and therefore, he was not a competent witness.

Appellant also introduced a statement of charges that alleged that, on March 12, 1987, Ty Brooks was observed riding as a passenger in a blue 1982 Oldsmobile. Donald M. Stoop, a staff investigator with the MidAtlantic Innocence Project, testified that his investigation revealed that Ty Brooks "had access to multiple vehicles," but "none [were] registered to him at the time."

## E.

### The Bollinger–Haddaway Tapes

Sergeant Bollinger, who became lead investigator on the Wilford murder case in 1999, testified that he spoke to Ms. Haddaway "several hundred times" before appellant's trial. One of the reasons Ms. Haddaway contacted Sergeant Bollinger in 2001 was to request that the criminal charges pending against her grandson, Landon Janda, be dropped. When questioned whether Ms. Haddaway asked "in an aggressive manner," Sergeant Bollinger stated that Ms. Haddaway "did everything in an aggressive manner."

At some point before February 2, 2001, Sergeant Bollinger participated in a meeting at the Talbot County State's Attorney's Office with Marie Hill, the prosecutor on appellant's case, and John Mark McDonald, the prosecutor on Mr. Janda's case. Sergeant Bollinger asked Mr. McDonald to drop the charges against Mr. Janda, but he "said no."

Sergeant Bollinger recorded some of his conversations with Ms. Haddaway because they were "directly involved with [his] homicide investigation."[22] One of these conversations occurred on February 2, 2001, during which Sergeant Bollinger told Ms. Haddaway that the State was not going to drop the charges against her grandson. Sergeant Bollinger tried to clarify whether she was "still going to come and tell the truth," and Ms. Haddaway replied: "I'm going to come in and tell the truth but I don't think the truth is going to want to be known."

---

[22] In addition to his testimony on the recorded conversations, Sergeant Bollinger also identified handwritten notes discussing the opinions of Ms. Haddaway held by other officers. A note from his interview of Corporal Cooper read: "Beverly Haddaway, as bad a woman as Talbot County has ever seen. Rather lie than tell the truth." A note from an interview with Captain Benjamin Blue read: "Either get out of trouble or . . . [g]et one favor up. No information is free from Beverly." Sergeant Bollinger stated that his colleagues' statements were simply "their opinion," not "part of [his] investigation." He asserted that, in his investigation, what Ms. Haddaway told him "turned out to be accurate and true," noting that Ms. Haddaway had given him her account of what happened on January 5, 1987, multiple times, and she had always been consistent that she saw the three men on Black Dog Alley immediately after the time of the murder. He agreed that the veracity of Ms. Haddaway's statements was bolstered by (1) the fact that she came forward early in the investigation, and (2) the accuracy of her description of the events that day, such as her correct description of the order in which the police vehicles and the ambulance responded to the crime scene.

Sergeant Bollinger then stated that he could ask the State to reconsider its position regarding her grandson after the trial, and the following occurred:

> Haddaway: Well, it won't be no need to ask after the trial's over because [defense counsel is] going to win hands down. They'll be doubt in everybody on the jurors' mind and I'm the one that's going to roll the iceberg right down there and watch that son of a bitch hit everybody in that fucking courtroom. Do you think I'm kidding, John? I'm not. You can go get the newspaper to start printing: Three People Found Innocent and I've got just one little piece of paper and it can all be had with one word that nobody knows but I know and I got the paper and I got the proof and one word, just one word out of the English language will let all three of them walk and for my grandson, you don't think I'll use that fucking word? . . . [23]
>
> Bollinger: [Chuckles]
>
> Haddaway: Now . . . . Do you think I'm kidding?
>
> Bollinger: No, I know you're not kidding. You just make me laugh sometimes.[24]

Ms. Haddaway subsequently stated that the one word was "crazy," meaning that she was crazy. She showed Sergeant Bollinger a document from a doctor that she had "an extensive emotional and psychological problem."

---

[23] Sergeant Bollinger testified that, when Ms. Haddaway referred to "all three of them," she was referring to appellant, Mr. Faulkner, and Mr. Andrews.

[24] Counsel asked Sergeant Bollinger whether he interpreted Ms. Haddaway's statement as "a threat." He stated that he did not, noting: "I laughed at her then, I laughed listening to it again. I heard this a hundred times so no it was not a threat." Counsel asked him if Ms. Haddaway was lying when she made the statement, and he responded: "Beverly just liked to blow off steam. . . . You call it lying. I disagree with your reference on that. She wasn't lying to me. She'd blow off steam, that's what she did." On cross-examination, he noted that there was "no doubt she was going to testify no matter what."

During that conversation, Ms. Haddaway suggested that Sergeant Bollinger go over Mr. McDonald's head to "the boss," i.e., the State's Attorney, to get the charges against Mr. Janda dropped. Sergeant Bollinger stated that he would talk to the State's Attorney.

During their conversations that day, statements were made indicating that Ms. Haddaway had access to case files related to the Wilford murder. For example, Sergeant Bollinger stated that he "got the stuff [she] wanted [him] to get," that she could "see the pictures if you want," and he got her "two pages of a letter" and a drawing of a ring. Ms. Haddaway indicated that defense counsel gave her things illegally, such as a report which she then underlined.

Sergeant Bollinger testified that he did not allow Ms. Haddaway to look through his "investigative file," but he did show her some photographs of the Wilford property and "a letter." Although it was not common practice for the police to permit a witness to look at case files before trial, he showed Ms. Haddaway the evidence "at the direction of the State's Attorney's Office." Counsel asked Sergeant Bollinger why he would "show a witness who was not by Ms. Wilford's house on January 5th, 1987 pictures of the property," and he responded: "She wanted to see them." Sergeant Bollinger could not recall whether he showed Ms. Haddaway an illustration of Ms. Wilford's ring, which the police believed was taken from Ms. Wilford's residence.

Sergeant Bollinger did note, however, that Mr. Eckel, who represented Mr. Andrews, had "allowed [Ms. Haddaway] to view everything he had in his possession."

He did not know whether she had access to "everything or not," but he did "know she had access to his files."

Sergeant Bollinger identified Ms. Haddaway's handwriting on a seven-page police report, written by Sergeant Gamble on June 8, 2000, that detailed an interview with Mr. Andrews. Ms. Haddaway wrote "lie" a number of times on the report. Sergeant Bollinger could not say when Ms. Haddaway made those annotations.

The February 2, 2001, conversation between Ms. Haddaway and Sergeant Bollinger also indicated that Ms. Haddaway had a conversation with Mr. Andrews before she testified at appellant's trial. Ms. Haddaway advised that she had gone to the jail with defense counsel and talked with "Ray." Although Sergeant Bollinger knew that Ms. Haddaway, a fact witness, had met with another fact witness, Mr. Andrews, he did not inform appellant's trial counsel of this fact.

On February 8, 2001, Sergeant Bollinger had another conversation with Ms. Haddaway, which he also recorded. That conversation referred to a conversation the previous day, where Sergeant Bollinger told Ms. Haddaway that the State's Attorney had decided to "nolle [pros] Landon's case."[25] Ms. Haddaway wanted the decision to be in

---

[25] There was conflicting testimony from the Office of the State's Attorney for Talbot County regarding what led to the nol pros of the charges against Landon Janda. Mr. McDonald, who was assigned to prosecute the case, testified that Scott Patterson, the State's Attorney for Talbot County, ordered him to dismiss the charges, telling him that "Beverly Haddaway was giving him trouble and . . . in the great scheme of things the murder case was more important." Mr. Patterson, however, testified that he did not "recall having a conversation with Sergeant Bollinger about Mrs. Haddaway in (continued . . .)

writing, but Sergeant Bollinger told her that was not going to happen.  Ms. Haddaway was not happy, and Sergeant Bollinger then said: "I don't know what they're gonna do.  But, but the only thing we want, and protecting whatever we're trying her[e], our interest, is all we're doing.  We have three murder trials coming up."[26]

As soon as Sergeant Bollinger finished recording these conversations, he put them in the case file, which "was sent to [a] centralized location . . . for the Maryland State Police homicide files."  He could not say whether the tapes made it to the State's Attorney's Office.  On cross-examination, Sergeant Bollinger agreed that he "made no effort to inform anybody of [the] alleged deal" with Ms. Haddaway," but he "also made no effort to hide it from anybody."  On redirect, counsel asked Sergeant Bollinger whether he "purposely . . . refused to put [the deal with Ms. Haddaway] in writing so that it would remain secret," and he responded: "That was not my decision."[27]

---

(. . . continued) that time frame in any regard," and to the best of his recollection, he "never spoke to Mr. McDonald about the Landon Janda case."

[26] We did not find in the record any written letter detailing the agreement to nol pros the charges against Mr. Janda.  Mr. McDonald stated that, although he was told to nol pros the case, he was not told to write a letter.  There were, however, two letters, one signed by Sergeant Bollinger, and one with the State's Attorney's signature, providing that Ms. Haddaway was supplying valuable information in the homicide investigation, and no charges would be brought against her for information related to the investigation.

[27] The parties below indicated that Ms. Haddaway passed away prior to the innocence hearing.

## F.

## Discovery Provided

Scott Patterson, the State's Attorney for Talbot County, testified that, at some point after taking office in 1991, he established an "open file" discovery policy. This policy entailed copying "everything in the file," i.e., "police investigative reports, witness statements, technical lab reports or, or reports from other experts, anything of that nature," but not "attorney's notes, work product, that sort of thing," and turning the copies over to the defense. He noted that confidential informants were "tricky," but if they were "actively involved in the case then they would have to be disclosed." Handwritten police notes would also be included "[i]f they were part of [a police] report."

Counsel then asked Mr. Patterson about his understanding of the State's *Brady* obligations.[28] He stated that "*Brady* now is a lot more comprehensive [than] it was 10, 15, 20, 35 years ago when I started prosecuting cases." He agreed that *Brady* as it currently is interpreted requires prosecutors to inquire into the knowledge of State agents "about the existence of any exculpatory information," but he could not say whether that rule was clear at the time appellant was prosecuted. Similarly, he agreed that, today, it would be a prosecutor's obligation, pursuant to *Brady*, to disclose to the defense an agreement between the State and a witness to drop charges against the witness' family member in exchange for the witness' testimony, but he could not say whether that rule was clear at the time appellant was prosecuted.

---

[28] *Brady v. Maryland*, 373 U.S. 83 (1963).

Ms. Hill testified that she complied with the State's discovery obligations in two ways: "automatic discovery" and "open file" discovery. She sent out the "basics" in "automatic discovery," which included documents such as a witness list, police reports, defendant, co-defendant, and witness statements, and an autopsy report. The automatic discovery packet included a "Suspect Information" list, which included the following:

> James Edward BROOKS
> William Clarence THOMAS
> Anthony BROOKS
>
> James BROOKS was originally a confidential source who came forward and provided information regarding an individual identified as William THOMAS. BROOKS alleged that THOMAS told him that he and Anthony BROOKS were responsible for the homicide. James BROOKS provided a written statement and submitted to a polygraph examination.

With respect to the Talbot County State's Attorney's Office's "open file" discovery policy in 2000 and 2001, "[defense] attorneys would have full access to [the State's] files. They could come in and go through [their] cases, the files for them." Defense attorneys could look at "[a]ny of the police reports, written statements, [and other] things that the defense was entitled to." They were permitted to take notes, request photocopies, and come back any time to review the files. Ms. Hill followed this open file discovery policy in appellant's case, and it was her intent to have defense counsel rely on their open file policy as her *Brady* disclosure.

Ms. Hill recalled that appellant's trial counsel came to her office to review the State's files, but she could not recall when that occurred. After trial was over, the files in each case were securely stored.

Ms. Hill could not recall if there were any audio or video cassette tapes in her files, but she noted that, if they were in her possession, defense counsel would have had access to them. Counsel showed Ms. Hill two audio cassette tapes containing the Bollinger-Haddaway conversations, but she did not recall seeing them before. She stated that, in her view, dismissing criminal charges against a grandson of a witness was not required to be disclosed under *Brady*.

## VII.

## The Circuit Court's Ruling

On June 21, 2016, the circuit court denied appellant's petition for writ of actual innocence and motion to reopen post-conviction proceedings, as well as those of Mr. Faulkner. As discussed in more detail, *infra*, the court found that the evidence presented did not indicate that appellant was innocent of the crimes, that the court was not "persuaded that there is newly discovered evidence that would lead to a substantial or significant possibility of a different result in the Petitioners' respective trials," and that it would not advance the interests of justice to reopen the post-conviction proceedings.

## DISCUSSION

## I.

## Petition for Writ of Actual Innocence

Appellant contends that the circuit court erred in denying his Petition for Writ of Actual Innocence. He asserts that the following evidence was "newly discovered" evidence that "mandates granting of [his] Innocence Writ": (1) the identification of

Ty Brooks as the person who left the palm prints on a window on the exterior of Ms. Wilford's utility room and the washing machine inside the room; (2) Mr. Keene's statement that he saw a vehicle in Ms. Wilford's driveway at approximately 2:00 p.m. on the day of the murder; and (3) the Bollinger-Haddaway tapes discussing, *inter alia*, the nol pros of the charges against Ms. Haddaway's grandson.[29]

Appellant argues that the court's ruling denying his petition was "premised on erroneous evidentiary rulings, factual findings unsupported by the record, and legal errors in determining" that the evidence was not newly discovered. He asserts that these errors prevented the court from "properly considering the totality of the evidence, which far exceeds the quantum necessary to demonstrate" that the new evidence created a substantial possibility that the result of the trial may have been different.

The State contends that the circuit court properly exercised its discretion in denying the petition. It makes two arguments in this regard. First, it argues that appellant did not present evidence of innocence, asserting that the above-referenced evidence was not

---

[29] Appellant's argument on appeal relating to Ms. Haddaway primarily focuses on information found in the Bollinger-Haddaway tapes. He does, however, reference "an array of additional exculpatory evidence," subsequently found "[b]uried in MSP files," which he asserts "demonstrated, among other things, [Ms.] Haddaway's true character as a dishonest, scheming manipulator who was always motivated by self-interest in stark contrast to the image she presented to the jury." In that regard, he cites a police report revealing that, in 1994, Ms. Haddaway sought to have criminal charges against her son dropped in exchange for information about the Wilford murder, handwritten notes regarding negative opinions of other officers regarding Ms. Haddaway's character, and immunity agreements stating that no charges would be brought against her for information relating to the Wilford murder. Given that the focus of appellant's argument is on the tapes, and that was the basis for the circuit court's decision, we will confine our analysis in this regard to the Bollinger-Haddaway tapes.

-36-

"exonerating" evidence.  Second, the State asserts that the circuit court did not abuse its discretion in concluding that appellant was not diligent in discovering the evidence that he alleges is "newly discovered."

In 2009, the Maryland General Assembly enacted Maryland Code (2016 Supp.) § 8-301 of the Criminal Procedure Article ("CP"), which allows certain convicted persons to petition for a writ of actual innocence based on newly discovered evidence.  *See Smallwood v. State*, 451 Md. 290, 313-20 (2017) (setting forth the legislative history of CP § 8-301).  CP § 8-301 states, in pertinent part, as follows:

> (a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
> (1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
> (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

> * * *

> (g) A petitioner in a proceeding under this section has the burden of proof.

The court has several options if it grants the petition; it "may set aside the verdict, resentence, grant a new trial, or correct the sentence, as the court considers appropriate." CP § 8-301(f)(1).

Thus, to prevail on a petition for writ of innocence, the petitioner must produce evidence that is newly discovered, i.e., evidence that was not known to petitioner at trial. *Hawes v. State*, 216 Md. App. 105, 134-36 (2014).  Pursuant to CP § 8-301, the newly discovered evidence must satisfy two requirements: (1) it must be such that it "could not

have been discovered in time to move for a new trial under Maryland Rule 4-331"; and (2) it must create "a substantial or significant possibility that the result may have been different."

The Maryland appellate courts, however, recently have made clear that there is a third requirement for newly discovered evidence. Relief under CP § 8-301 is limited to situations where the petitioner shows newly discovered evidence that supports a claim that the petitioner is innocent of the crime of which he or she was convicted. *See Smallwood*, 451 Md. at 320 ("Only defendants who can allege that they are 'actually innocent,' meaning they did not commit the crimes for which they were convicted, may bring a petition for relief under [CP] § 8-301."); *Yonga v. State*, 221 Md. App. 45, 61-62 (2015) (The "thrust of the writ" and the "substantive object that has to be asserted and then supported by an adequate show of proof" is actual innocence.), *aff'd on other grounds*, 446 Md. 183 (2016). *See also Douglas v. State*, 423 Md. 156, 176 (2011) (a petition for writ of actual innocence gives a convicted person "an opportunity to seek a new trial based on newly discovered evidence that speaks to his or her actual innocence"); *Blake v. State*, 395 Md. 213, 219 (2006) (CP § 8-201 was "designed to provide an avenue for the exoneration of the actually innocent"); Md. Rule 4-332(d)(9) (petition for writ of actual innocence must allege "that the conviction sought to be vacated is based on an offense that the petitioner did not commit.").

Accordingly, a petitioner asserting newly discovered evidence must satisfy three requirements to prevail in a petition for actual innocence. A petitioner must produce newly

discovered evidence that: (1) "speaks to" the petitioner's actual innocence; (2) "could not have been discovered in time to move for a new trial under Md. Rule 4-331"; and (3) creates "a substantial or significant possibility that the result may have been different."[30]

When an appellate court reviews a circuit court's decision to deny a petition for writ of actual innocence, we limit our review "to whether the trial court abused its discretion." *Smallwood*, 451 Md. at 308-09. *Accord Patterson v. State*, 229 Md. App. 630, 639 (2016), *cert. denied*, 451 Md. 596 (2017). "Under that standard, this Court will not disturb the circuit court's ruling, unless it is well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *Patterson*, 229 Md. App. at 639 (citations and quotation marks omitted). A trial court must, however, "'exercise its discretion in accordance with correct legal standards.'" *Jackson v. Sollie*, 449 Md. 165, 196 (2016) (quoting *Alston v. Alston*, 331 Md. 496, 504 (1993)). With respect to the circuit court's factual findings, we accept these findings unless clearly erroneous. *Yonga*, 221 Md. App. at 95.

Applying this standard of review, we address the requisite elements of a petition for writ of actual innocence as they apply to the present case. Initially, we note that there is

---

[30] As Judge Moylan explained in *Yonga v. State*, 221 Md. App. 45, 57-58, 62 (2015), *aff'd on other grounds*, 446 Md. 183 (2016), the test that the newly discovered evidence "creates a substantial or significant possibility that the result may have been different" is "simply the weight or level of persuasion that the newly discovered evidence of actual innocence must possess in order to justify the issuance of the writ." Putting forth a "mere bald assertion of actual innocence or some highly speculative or unsupported claim of actual innocence is not enough to justify the granting of a writ. The claim must be substantial enough for the hearing judge to conclude that there may, indeed, be a plausible case of actual innocence." *Id.*

no dispute that the three categories of evidence, the Keene evidence, Ty Brooks' palm prints, and the Bollinger-Haddaway tapes, were not known at trial, and therefore, this evidence was newly discovered evidence. There is a dispute, however, regarding whether this newly discovered evidence meets the three requirements to entitle appellant to relief. We will address, in turn, these requirements.

## A.

## Actual Innocence

As indicated, a petition for writ of actual innocence is limited to cases involving newly discovered evidence that "speaks to" the petitioner's actual innocence. The State argues that this requirement was not met here because the newly discovered evidence alleged, i.e., the Keene evidence, Ty Brooks' palm prints, and the Bollinger-Haddaway tapes, "did not tend to exonerate" appellant.

The State points to several categories of evidence that were provided to the General Assembly as types of evidence that could support a finding of innocence, including scientific evidence found after trial "'to be unreliable or completely false after subsequent research and analysis,'" *Smallwood*, 451 Md. at 318 (quoting Testimony of Delegate Samuel I. Rosenberg on H.B. 366, before the House Judiciary Committee (Feb. 17, 2009)), as well as:

> (1) a confession by another individual to having committed the crime; (2) acknowledgement by an eyewitness or other evidence indicating he was mistaken; (3) acknowledgment by an eyewitness or other evidence indicating that the witness intentionally lied; or (4) evidence casting serious doubt on the reliability of scientific evidence used against the defendant.

*Id.* at 319 (quoting Memorandum from the Governor's Office of Crime Control and Prevention and the Office of the Public Defender to Chairman B. Frosh and Members of the Senate Judicial Proceedings Committee, at 8-9 (Jan. 15, 2009)).

With respect to the newly discovered evidence here, the State contends that the evidence regarding Mr. Keene did not tend to exonerate appellant and was not "the type of evidence that the Court of Appeals noted in *Smallwood* that an innocence petition was designed to address." It asserts that the Bollinger-Haddaway tapes "do not show Haddaway as a recanting, mistaken or intentionally lying eyewitness." With respect to the Ty Brooks palm prints, it contends that the "presence of his palm prints in Mrs. Wilford's home does not mean" that appellant was "not in Mrs. Wilford's home at the time of the murder."

The State's view of the type of evidence of innocence required under CP § 8-301 is too narrow. Initially, as appellant notes, the enumerated list of types of evidence that could support a finding of innocence, upon which the State relies, was a recitation of categories of evidence provided to the General Assembly by various stakeholders; it did not purport to be an exhaustive list. Moreover, no case has held that the evidence must definitively exonerate the petitioner.

We hold that, although CP § 8-301 applies only to newly discovered evidence that "speaks to" actual innocence, the petitioner need not definitively prove his or her innocence to warrant relief under the statute. That the newly discovered evidence does not definitively exonerate appellant, or may be countered by other evidence, goes to the weight

-41-

of the evidence, which is considered in the third part of our analysis.  In the first part of the analysis, we look to whether the newly discovered evidence "speaks to," or could support, a claim that the petitioner did not commit the crime for which he or she was convicted.

Applying this analysis to the present case, we conclude that the newly discovered evidence "speaks to," or could support, appellant's claim that he did not commit the crimes for which he was convicted.  Appellant contends that the match of the palm prints found at the scene to Ty Brooks, a person with a history "of committing crimes similar to the break-in that led to Mrs. Wilford's murder," and which corroborated "a 1992 informant's report that [Mr.] Thomas confessed that [he] and [Ty] Brooks committed the murder," shows that Ty Brooks, and not appellant, was guilty of the murder.  We agree that the palm print evidence, as well as the Keene observation, "speaks to" appellant's innocence because the evidence, if believed and sufficiently proved, could support appellant's contention that "two career criminals, Ty Anthony Brooks and William Thomas, Jr., actually committed this crimes."  To the extent the evidence was offered to show that someone other than appellant and Mr. Faulkner committed the crime, it was evidence that supports a claim of actual innocence.

With respect to the Bollinger-Haddaway tapes, appellant argues that they undermine "the State's Haddaway-based theory of the crime."  He contends that Ms. Haddaway was a crucial witness for the State, and the statements that Ms. Haddaway made in those recordings places her credibility and objectivity seriously into question.  Appellant asserts that the tapes show that Ms. Haddaway "extorted a deal from the prosecution with threats

to torpedo the State's case by threatening to 'come in and tell the truth' that the State would not 'want to be known,'" and they "reveal a shocking level of corruption, an utter disregard for the truth, and the willingness of the prosecution to give in to extortion to obtain [appellant's] conviction."

Although appellant's characterization of the effect of the tapes appears to be overstated, we do agree that the tapes could support an argument that Ms. Haddaway may have deliberately lied. In the context of this case, where Ms. Haddaway was a key witness for the State implicating appellant, and the new evidence could significantly impair her credibility regarding the core merits of the case, we conclude that this newly discovered evidence satisfies the first prong of the analysis, i.e., the evidence speaks to actual innocence. *See Smallwood*, 451 Md. at 319 (listing as an example of evidence supporting a finding of innocence evidence indicating that an eyewitness intentionally lied).

**B.**

**Could Not Have Been Discovered by Due Diligence**

Having determined that the newly discovered evidence satisfies the first requirement, we turn to the second prong of the analysis, which is whether the newly discovered evidence "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." CP § 8-301(a)(2). A Rule 4-331 motion based on newly discovered evidence must be filed "within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post

conviction relief." Rule 4-331(c)(1). Here, the docket entries indicate that the circuit court received the mandate from this Court affirming his convictions on direct appeal on February 8, 2005. Accordingly, the appellant must show that the newly discovered evidence could not have been discovered before the one-year deadline of February 8, 2006.

It is important to note that the requirement that the petitioner show that evidence could not have been discovered at an earlier time does not require that defense counsel exhaust every lead or seek to discover a needle in a haystack. *Cf. Maryland v. Kulbicki*, 136 S. Ct. 2, 4-5 (2015) (standard of "reasonable competence" does not require defense counsel to "go 'looking for a needle in a haystack,' even when they have 'reason to doubt there is any needle there'") (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). Rather, CP § 8-301(a)(2) requires only that defense counsel exercise due diligence to discover evidence. *See Hawes*, 216 Md. App. at 136 (CP § 8-301(a)(2) requires a showing that newly discovered evidence "could not, with due diligence, have been discovered in time to move for a new trial under Maryland Rule 4-331."). *See also Argyrou v. State*, 349 Md. 587, 600-01 (1998) ("To qualify as 'newly discovered,' evidence must not have been discovered, or been discoverable[,] by the exercise of due diligence."); Md. Rule 4-332(d)(6) (A petition for a writ of actual innocence must allege that it is based on "newly discovered evidence" "which, with due diligence, could not have been discovered in time to move for a new trial pursuant to Rule 4-331.").

This second requirement, that the evidence could not, with due diligence, have been discovered in time to move for a new trial, is "a threshold question." *Argyrou*, 349 Md. at

604.  *Accord Jackson v. State*, 216 Md. App. 347, 364, *cert. denied*, 438 Md. 740 (2014).

"[U]ntil there is a finding of newly discovered evidence that could not have been discovered by due diligence, no relief is available, 'no matter how compelling the cry of outraged justice may be.'"  *Argyrou*, 349 Md. at 602 (quoting *Love v. State*, 95 Md. App. 420, 432 (1993)).

Here, appellant claims that the newly discovered evidence, including Mr. Keene's observations, the identification of Ty Brooks' palm prints, and the Bollinger-Haddaway tapes, satisfied this requirement.  The circuit court disagreed, and we review that decision for an abuse of discretion.  *See Love*, 95 Md. App. at 435 ("We cannot say that [the judge] abused his discretion in finding the absence of due diligence.").  With this background in mind, we review the three categories of evidence at issue.

**1.**

**The Keene Evidence**

We begin with appellant's contention that information contained in undisclosed MSP notes and Betamax videotapes of an interview with Mr. Keene, indicating that Mr. Keene saw an Oldsmobile at Ms. Wilford's house the day of the murder at 1:55 p.m., was newly discovered evidence that could not have been discovered with due diligence before February 2006.  The circuit court rejected that argument, noting that the following statement, available to defense counsel prior to trial, was contained in a report by Trooper Harmon:

> Same date [January 9, 1987,] the writer [Sergeant Harmon] and Tfc. Shelly were contacted at the Easton Barrack by Danny Keene.  He reported seeing

a silver colored vehicle he believed to be an Olds Cutlass. He was taken to the victim's residence, at which time he showed the writer the location he observed the vehicle parked. The location was backed in next to the front porch, next to several bushes, bearing a similar type leaf as found in the living room floor of the victims [sic] house. He was [driven] around Easton, and upon observing a vehicle at the Bonanza Rest[a]urant, he stated it was a vehicle similar to the one he observed. He had picked out a 77 Olds Cutlass. Refer to Tfc. Shelly's supplements for further details of this individuals [sic] interviews.

Appellant contends that this report was part of "over 700 pages of documents" provided in discovery, and because it did not "indicate when [Mr. Keene] saw the vehicle," "there was nothing to tip anyone that he had seen the vehicle at the time of the murder."[31] The circuit court, noting that it must consider the totality of the circumstances in considering due diligence, found that the "substance of Mr. Keene's testimony was available at trial and [appellant was] on notice that he was a possible witness." Because the State's theory of the case was that appellant and his two companions were "on foot" on January 5, 1987, and they walked several miles to Ms. Wilford's house and back to Black Dog Alley, the court reasoned that "any information that would have contradicted the story that [they] were on foot for the entire time would have been highly relevant to mounting a defense." The circuit court found that "[d]ue diligence required a reasonable good faith effort to follow up on this information and assess Mr. Keene's credibility."

---

[31] Mr. Faulkner, in his separate appeal arising from the court's ruling, states that this "paragraph was not even a 'needle in a haystack'; it was the shaft of a needle without the eye," and even if counsel had focused on this paragraph, the critical detail of the date and time was missing.

We perceive no abuse of discretion in the circuit court's finding in this regard. It is undisputed that appellant was provided access to the Harmon police report, which included Mr. Keene's observation. And as the circuit court stated, a sighting of a vehicle at Ms. Wilford's house would have been relevant, either to counter the State's theory that appellant travelled on foot to and from Ms. Wilford's residence or to develop whether someone else was at the residence at the time of the murder. The defense could have discovered the time when Mr. Keene saw the car by contacting Mr. Keene or seeking to review the "supplements" referred to in the report, which included "further details." A reasonable investigation would have led them to discover the additional details regarding the timing of his observation. *See Argyrou*, 349 Md. at 605 ("'[D]ue diligence' contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her.").

Accordingly, the circuit court did not abuse its discretion in finding that appellant failed to exercise due diligence by not investigating further into Mr. Keene's sighting of a car, and therefore, that the evidence of the timing of the observation did not constitute "newly discovered evidence" that could not have been discovered with due diligence in time to move for a new trial under Maryland Rule 4-331. Because the newly discovered Keene evidence did not satisfy the second prong of the analysis, the court was not required to address the third requirement, that it creates a substantial possibility that the result of the

trial may have been different, before concluding that this evidence did not warrant granting the petition for writ of actual innocence.[32]

## 2.

### Bollinger-Haddaway

Appellant next claims that the circuit court erred in finding that the Bollinger-Haddaway tapes, which were not discovered until after the New York Innocence Project filed a MPIA request in 2011, did not qualify as newly discovered evidence pursuant to CP § 8-301. Appellant contends that these tapes revealed: (1) the State's agreement to Ms. Haddaway's demands to drop charges against her grandson; (2) that Ms. Haddaway, Mr. Andrews, and his attorney, Mr. Eckel "colluded to frame" appellant; and (3) that Ms. Haddaway was "a dishonest, scheming manipulator."

The circuit court initially found that the tapes, "which discuss an agreement between the State and Ms. Haddaway to *nolle prosequi* the case against her grandson," were not

---

[32] The circuit court's findings also indicate that it found Mr. Keene's statement that he observed a car at the Wilford residence to be unbelievable. The court stated:

> [W]ere his testimony to be believed the car that he saw would have been obscured from his view because of the line of trees, the shape o[f] Mrs. Wilford's home and the direction that he was travelling until he reached her driveway. It would then appear that he would have had to have turned his head 90 degrees to see the front of the car as he passed Mrs. Wilford's driveway. The remainder of his description of the vehicle would have had to come from observing the car in his rearview mirror.

To the extent that the circuit court found the testimony incredible, a finding that was not clearly erroneous, this would be another basis to find that the Keene evidence did not justify a grant of a petition for writ of actual innocence.

disclosed prior to trial. Given this undisputed factual finding that the tapes were not known to appellant at trial, and were discovered more than 10 years later, they constituted "newly discovered evidence." *See Hawes*, 216 Md. App. at 136 (report in existence prior to trial but not known to defendant was newly discovered evidence).

The circuit court, therefore, correctly stated that the question "becomes whether this information could have been discovered within the timeframe set forth in Rule 4-331(c)." The court concluded that appellant's argument that the tapes could not have been discovered in this timeframe was "doomed by [his] own efforts," noting that appellant discovered the tapes through his MPIA requests, and "[t]hese requests could have been made within the time frame set forth in Rule 4-331(c) and the information could have been available." Accordingly, the circuit court concluded that "the tapes of the Haddaway/Bollinger conversations do not meet the definition of newly discovered evidence" that warrants relief under CP § 8-301.

Appellant contends that the circuit court erred in holding that due diligence required him to file a MPIA request to discover the tapes prior to the Rule 4-331(c) deadline. He notes that, pursuant to *Conyers v. State*, 367 Md. 571, 603, *cert. denied*, 537 U.S. 942 (2002), when a prosecutor relies, as the State did here, on an open file policy to satisfy its *Brady* obligations, "defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*." He asserts that he was "allowed to take the State at its word that it disclosed all of its evidence through its open file and there was no exculpatory evidence," and "[d]iligence did not require him to seek

the information that was hidden from him." Appellant also contends that the circuit court's due diligence ruling conflicts with this Court's decision in *Hawes*, which he asserts "rejected an identical argument" and held "that exculpatory evidence suppressed by the State was 'newly discovered' for the purposes of a writ of actual innocence, even though it was later obtained through public information requests."

The State argues that "the court's due diligence determination as to the discoverability of . . . the Haddaway/Bollinger tapes was a proper exercise of the court's discretion." It contends that appellant failed to demonstrate that his trial counsel was diligent in counsel's review of the State's files, asserting that the evidence adduced at the hearings below indicates that "the tapes were contained within the police investigative files," and it was "not usual for defense counsel to sift through the police investigative files in advance of trial." The State also argues that it was not unreasonable for the court to conclude that appellant was not diligent because he could have filed a MPIA request "to review the investigative boxes post-trial, before the expiration of the Rule 4-331(c)" time period. Finally, the State disagrees that *Hawes* resolves the issue here.

We begin with appellant's reliance on *Hawes*. Initially, we note that, in *Hawes*, 216 Md. at 130-31, the circuit judge dismissed the petition for writ of actual innocence without a hearing, and the issue we addressed involved the pleading requirements for a petition for writ of actual innocence, not the burden of proof at the hearing, the issue here. The petition in *Hawes* was based, in part, on a withheld police report that subsequently was obtained through a MPIA request. *Id.* at 134-36. We noted that defense counsel diligently attempted

to obtain all police reports prior to trial, through discovery requests and subpoenas, but he did not receive it until a MPIA request was filed after trial. *Id.* Hawes did not allege in his petition, however, the date that he received the report. *Id.* at 137. We explained that this was a "critical" date because it determined whether he could have moved for a new trial within the one-year time frame. *Id.* at 136-37. In light of that deficiency, we concluded that Hawes' petition did not state a claim for writ of actual innocence as a matter of law, and the circuit court properly dismissed the petition without a hearing. *Id.* at 137. *Hawes* did not, as appellant asserts, address whether "due diligence" requires a criminal defendant to file a MPIA request to seek documents not disclosed.[33]

In this case, we will address whether "due diligence" requires a criminal defendant to file a MPIA request. In this regard, we note that the State was obligated to disclose the Bollinger-Haddaway tapes, which included favorable impeachment evidence of Ms. Haddaway's request for dismissal of charges against her grandson. A prosecutor has a duty to disclose any understanding or agreement with a key witness requiring a future prosecution because it would be relevant to the witness' credibility. *State v. Williams*, 392 Md. 194, 210 (2006); *Conyers*, 367 Md. at 597-98. This disclosure obligation exists even as to evidence "known only to police investigators and not to the prosecution." *Id.* at 602 (quoting *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999)). *Accord Riggins v. State*, 223

---

[33] *Hawes v. State*, 216 Md. App. 105, 136-37 (2014), makes clear that a petitioner will not prevail on a petition for writ of actual innocence if he was *actually aware* of the "newly discovered" evidence, by knowledge gained through a MPIA request or otherwise, in time to move for a new trial pursuant to Rule 4-331.

Md. App. 40, 56 (2015) ("That the . . . reports were in the physical possession of the [Police] Department did not obviate the State's responsibility to disclose them."). Md. Rule 4-263(c)(22) (the obligations of the State's Attorney extend to material and information that must be disclosed under this Rule and "are in the possession or control of the attorney, members of the attorney's staff, or any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case."). Indeed, the State conceded below, and on appeal, that it should have turned over the Bollinger-Haddaway tapes to appellant pursuant to its disclosure obligations.

We hold that the due diligence requirement in CP § 8-301 does not encompass a requirement that a defendant file a MPIA request with the police, or other agency that reports to the prosecutor, seeking information that the State is required to disclose pursuant to *Brady* and Rule 4-263. As appellant notes, a criminal defendant should be able to rely upon the State to comply with its *Brady* and discovery obligations. *Conyers*, 367 Md. at 603 ("'[I]f a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.'") (quoting *Strickler*, 527 U.S. at 283 n.23).

The parties do not cite, and we have not found, any case supporting the proposition that due diligence requires a defendant to file a public information act request to double-check that the State complied with its disclosure obligations. The only case found to be

remotely on point is *Ex Parte Miles*, 359 S.W.3d 647, 671 (Tex. Crim. App. 2012). In that case, the court did not specifically discuss this issue, but it held that, where the State failed to produce police reports that identified other potential suspects, and reports were discovered years later pursuant to a Freedom of Information Act request, the evidence constituted newly discovered evidence that could not be known with the exercise of due diligence. This holding supports, albeit indirectly, our holding that the due diligence requirement in CP § 8-301 does not encompass a requirement that a defendant file a MPIA request to ensure that the State complied with its disclosure obligations.

The circuit court, in finding that appellant did not meet the requirement of due diligence in discovering the Bollinger-Haddaway tapes because he did not file an earlier MPIA request, misconstrued the legal standard for due diligence. Accordingly, the circuit court abused its discretion in finding that the Bollinger-Haddaway tapes did not meet the second requirement for newly discovered evidence, i.e., that it could not have been discovered with due diligence in time to move for a new trial pursuant to Rule 4-331. *See Jackson*, 449 Md. at 196 ("'[A] trial court must exercise its discretion in accordance with correct legal standards.'") (quoting *Alston*, 331 Md. at 504); *Bass v. State*, 206 Md. App. 1, 11 (2012) ("'[A]n exercise of discretion based upon an error of law is an abuse of discretion.'") (quoting *Brockington v. Grimstead*, 176 Md. App. 327, 359 (2007)).

At oral argument, the State shifted gears and argued, as an alternative ground, that the circuit court properly found a lack of due diligence because the tapes were contained within the police investigation files (although mislabeled), and counsel could have looked

through these files, either in advance of trial or after conviction. Again, the issue is not whether counsel *could* have looked through these files. Rather, the issue is whether due diligence *required* counsel to seek review of the files for information that the State was obligated to provide. As indicated, when the State has an obligation to provide evidence, defense counsel is entitled to rely on the State's disclosure as satisfaction of its obligation. In a situation such as that involved here, where the State uses open file discovery to satisfy its obligations, and defense counsel has no reason to believe that the State has not satisfied those obligations, due diligence does not require defense counsel to "scavenge for hints of undisclosed *Brady* material." *Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) (rule declaring "'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

We also note that, even if defense counsel had looked through the police boxes during the course of preparing for trial, a fact that is not clear from the record, counsel might not have seen the tapes.[34] In addition to the evidence that the tapes subsequently were found in a mislabeled envelope, the tapes were not created until February 2 and February 8, 2001, and appellant's trial began approximately three weeks later, on February 26, 2001. Thus, even if counsel had requested to see the police files and been granted

---

[34] The State refers to Sergeant Metzger's testimony at the innocence hearing as support for its argument that defense counsel looked at the boxes. Sergeant Metzger however, did not become involved with the Wilford murder investigation until 2014. Her testimony, therefore, did not address what defense counsel looked at prior to trial.

access during pre-trial investigation, the tapes may not have been in existence at the time of access. Once the tapes were made, the State had the obligation to disclose them

Accordingly, the Bollinger-Haddaway tapes meet the second prong of the analysis; they could not have been discovered with due diligence in the requisite time period. As discussed in more detail, *infra*, this evidence, therefore, must be assessed to determine if it satisfies the third requirement for newly discovered evidence pursuant to CP § 8-301, whether it creates a substantial possibility that the result of the trial may have been different.

## 3.

## Palm Prints

We turn next to the third item of newly discovered evidence, the discovery more than ten years after appellant's conviction that Ty Brooks' palm prints matched the prints discovered in Ms. Wilford's utility room. Appellant contends that the circuit court erred in finding that this newly discovered evidence failed to satisfy the second requirement, that it could not have been discovered with due diligence within the requisite time period.

In addressing this claim of newly discovered evidence, the circuit court found as follows:

> Again the court must consider the totality of the circumstances to determine whether this identification could have been known at the time of trial as a result of due diligence. First, as noted before, the identification [of] Ty Brooks as a possible suspect was available to the Petitioners at the time of their respective trials because of the statement that James Brooks made to Trooper Wiley. The crux of the Petitioners' contention is that the AFIS system was not in place at the time of trial, and, therefore, matching the latent palm print to Ty Brooks. Mr. M[a]nkevich, whose testimony the court finds

-55-

to be credible, stated that, although there had been advances in the ways of gathering information, the fundamental means of identifying fingerprints, visual observation, is the same technique that was available in 1987 and 2000. He also stated that the AFIS did not represent a new technology for comparing prints. It was a much more efficient database for finding known prints and became available in 2008.

Mr. M[a]nkevich testified that, between June 2000 and March 2016, the prints of seven people, including the Petitioners, Ty Brooks and Boozie Thomas, had been compared to the latent palm prints. Mr. M[a]nkevich noted that the palm print used to identify the latent print with Ty Brooks was on file, and that it was not necessary to have him take additional prints. He did not indicate the file print from Mr. Brooks.

Looking at the totality of the circumstances, it appears to the court that due diligence would have required the Petitioners to seek palm prints from Ty Brooks and Boozie Thomas through the use of Rule 4-264. Again, the MSP investigative file, which was available to the Petitioners, indicated that these two men were suspects in the murder.[35]

Accordingly, any evidence regarding the possible identification of Ty Brooks and Boozie Thomas to the murder was available to the Petitioners at the time of their trial and could have been obtained through due diligence. In this regard, it should be noted that Mr. Smith's defense was premised on the lack of credibility of Ms. Haddaway . . . . The purpose of the statute is to afford the innocent the opportunity to show their innocence, and not to recast their defense with information that was otherwise available to them.[36]

---

[35] The court earlier noted that the MSP investigative file, which was available to defense counsel, contained a document referencing a statement made by James Brooks to Trooper Wiley, stating that Mr. Thomas told James Brooks that Mr. Thomas and Ty Brooks went to the victim's house to rob it, Ms. Wilford came home, and Mr. Thomas stabbed her. The court indicated that, based on this statement, appellant "could have availed [himself] of Rule 4-264 to get the fingerprints of [Mr.] Thomas and Ty Brooks."

[36] In an earlier part of the opinion, the court stated that, based on Mr. Mankevich's testimony regarding distortion on the latent print found on the window that resulted from rain, the palm print appeared to tie Ty Brooks to Ms. Wilford's house on a day prior to the murder. Appellant strenuously argues that the court misconstrued Mr. Mankevich's testimony, and the court's factual findings in this regard are clearly erroneous. The record appears to support this contention, and we suggest that the circuit court revisit this issue on remand.

Appellant contends that the court's ruling that he could have obtained evidence that the unidentified palm print belonged to Ty Brooks was erroneous, asserting that "reasonable diligence does not require defense counsel to conduct a full forensic investigation into dozens of potential suspects that the State ruled out." He argues that the search was impossible prior to the addition of palm prints to the database in 2009. Accordingly, he asserts, "the palm print match and all the information that flowed from that match were not available through the exercise of diligence."

The State concedes that the court's finding that appellant could have obtained palm prints from Ty Brooks pursuant to Rule 4-264 was erroneous, stating that Rule 4-264 "has little utility [to appellant] in this context." That concession was appropriate.

Maryland Rule 4-264 provides, in relevant part, as follows:

> On motion of a party, the circuit court may order the issuance of a subpoena commanding a person to produce for inspection and copying at a specified time and place before trial designated documents, recordings, photographs, or other tangible things, not privileged, which may constitute or contain evidence relevant to the action.

In *Chew v. State*, 71 Md. App. 681, 721 (1987), *vacated on other grounds*, 317 Md. 233 (1989), this Court held that Rule 4-264 "does not authorize subjecting a human being to physical examination, such as the furnishing of pubic hair, a blood sample, a voice exemplar, etc." Pursuant to this reasoning, Rule 4-264 would not have permitted appellant to obtain an order requiring Ty Brooks to provide a palm print.

The State argues, however, that although the circuit court's reliance on Rule 4-264 was erroneous, the court's "point—that [a]ppellants could have set into motion legal

proceedings to compel Ty Brooks to submit to fingerprinting—is well founded." At oral argument, when pressed to explain what mechanism counsel could have used in this regard, counsel for the State argued that appellant could have asked the circuit court to issue an order to compel Ty Brooks to submit to palm printing based on *Howard v. State*, 232 Md. App. 125, 156-57 (2017), which the State argues supports the proposition that the due process right to present a meaningful defense would enable a defendant to obtain such evidence, based on need.

We are not persuaded by the State's argument. In *Howard*, 232 Md. App. at 146, this Court stated that, in a criminal case, "discovery only may be obtained when permitted by the common law, by statute, or by court rule, or when it is constitutionally necessary." We declined to decide whether "the Due Process Clause of the Fourteenth Amendment entitles a criminal defendant to obtain, pre-trial, evidence relevant and material to his defense that is not in the possession or control of the SAO," noting that, even if it did, Howard failed to make the requisite threshold showing of a need to make an inspection of the crime scene, the rape victim's home, to obtain evidence that was relevant and material to his defense. *Id*. at 158. This case, the only authority cited by the State, does not support the State's argument that appellant was entitled to a court order to have Ty Brooks submit his palm prints or that defense counsel did not act with due diligence in failing to seek such an order.

The State also argues that counsel could have asked Mr. Mankevich to manually compare the palm prints found at the murder scene with Ty Brooks' prints, which it asserts

"were already on file." It contends that appellant knew that Ty Brooks was a suspect, based on the statement by James Brooks that Mr. Thomas identified himself and Ty Brooks as possible perpetrators. Under these circumstances, the State argues that Ty Brooks' prints "were discoverable," and due diligence required a request to compare the unidentified prints found at the scene with those of Ty Brooks.

There are two problems with this argument. First, contrary to the State's assertion, the evidence does not reflect that Ty Brooks' palm prints were on file and available for a manual comparison, either at the time of trial or during the time period in which to file a motion for new trial. Indeed, the record reflects that the police did not begin taking palm prints of arrestees in the area until after Ms. Wilford's murder, and the known palm prints that Mr. Mankevich used to make the match were taken from Ty Brooks in 2011.

Second, as appellant notes, Ty Brooks was one of 24 potential suspects disclosed to trial counsel, not including appellant, Mr. Faulkner, and Mr. Andrews. To be sure, this list of persons who could have left the palm prints could be further narrowed down to 12, including Ty Brooks, Boozie Thomas, and James Brooks, based on police records that showed that other suspects already had been palm printed or could otherwise be eliminated as suspects. Ty Brooks, however, remained as just one of a number of suspects.[37] Given

_____

[37] Other suspects who had not had their palm prints taken, pursuant to the suspect list in the State's files, included: a "prison escapee" who was reported by a neighbor of the victim as a possible suspect; the minister of Ms. Wilford's church who had "scratches on his face on the day following the homicide" and who allegedly was "extremely upset over the victim's death even though he hardly knew her"; a man who allegedly told his employer that his sister's boyfriend and the boyfriend's brother had committed the (continued . . .)

the number of possible suspects, we cannot conclude that "due diligence" required appellant to take legal action, assuming that was possible, to obtain palm prints of all of the potential suspects, including Ty Brooks, Mr. Thomas, and James Brooks, and have them manually compared to the crime scene lifts.

We agree with appellant that the palm print "match" satisfied the second prong of the CP § 8-301 test, i.e., newly discovered evidence that could not have been discovered by due diligence in the requisite time period. It is not disputed that the palm print match was not known prior to February 2006, and the capability of the automated system to conduct palm print searches was not available before 2009, when the State's AFIS vendor added the function. Under these circumstances, and given that the match was determined only after a new development in matching technology, we hold that the evidence that the previously unidentified palm print was a match to Ty Brooks constitutes newly discovered evidence that could not have been discovered with due diligence. *See Ward v. State*, 221 Md. App. 146, 163 (2015) (newly discovered evidence can include new testing methods that did not exist at trial and are used to test evidence introduced at the original trial). *See also Ex Parte Miles*, 359 S.W.3d at 664 (new evidence of identification of the source of

---

(. . . continued) homicide but "denied making such statement" when questioned by the police; a man implicated via "anonymous letter"; a confidential source who later became a suspect when it was discovered that he was "very paranoid," allegedly "stab[bed] . . . walls and counter tops" with a knife to frighten his estranged wife, and attempted to "burn [his wife's] house down while she was still inside"; a "former bo[a]rder" of Ms. Wilford who was implicated by a confidential source; and a man who allegedly told a cellmate that "he was a hired killer and had just completed a job on the 'Shore' for ten thousand dollars," which involved killing a woman.

the previously unidentified fingerprint was "not ascertainable through the exercise of reasonable diligence" prior to the requisite time period). The circuit court abused its discretion in finding to the contrary.

In sum, appellant met his burden of showing that the palm print evidence and the Bollinger-Haddaway tapes constituted newly discovered evidence that could not have been discovered in the exercise of due diligence in time to move for a new trial pursuant to Rule 4-331. Accordingly, the next step in the analysis is whether that evidence met the third requirement for newly discovered evidence, that it creates "a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." CP § 8-301(a)(1).

## C.

### Substantial Possibility of a Different Result

The third prong of the analysis "involves a determination regarding the impact of the evidence." *Jackson*, 216 Md. App. at 366. The test is "whether, if [the convicting] jury had had the benefit of the newly discovered evidence as well as the evidence that was before them, would there be 'a substantial or significant possibility that the result would have been different?'" *Yonga v.* State, 446 Md. 183, 211 (2016) (quoting *Yonga*, 221 Md. App. at 69) (internal quotation marks omitted). "'[T]he substantial or significant possibility standard falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable.'" *McGhie v. State*,

449 Md. 494, 510 (2016) (quotation marks omitted) (quoting *Yorke v. State*, 315 Md. 578, 588 (1989)).

Appellant contends that the circuit court erroneously discounted the significance of the newly discovered evidence, which he asserts "both (1) undermines the State's case against Smith at its core and (2) implicates Brooks and Thomas as the murderers." He argues that, given the presence of Ty Brooks' prints at the point of entry, "corroborated by [Mr.] Thomas' confession independently made years earlier, [Mr.] Keene's observation of a suspicious car at the house, and evidence showing [Ms.] Haddaway's corruption of the prosecution, the proof of innocence is overwhelming."

The State argued in its brief that, given the court's determination that appellant did not exercise due diligence with respect to discovering the new evidence, "it is not necessary to consider whether the evidence created substantial possibility of a different outcome." As indicated, we have rejected that proposition, at least with respect to the palm print evidence and the Bollinger-Haddaway tapes. On the merits of the court's decision in this regard, the State argues merely that the circuit court is presumed to properly exercise its discretion in applying the substantial possibility test to the evidence.

Our review of the circuit court's memorandum opinion suggests that the circuit court rested its decision on its finding that the second prong of the test, due diligence, was not satisfied, and therefore, the court did not address the third prong, the substantial possibility of a different result. After a five-page discussion of the evidence as it related to the second prong of the test, the circuit court stated as follows:

The court is, therefore, not persuaded that the Petitioners have proved that there is a substantial or significant possibility that the result in their respective trials. Nor is the court persuaded that there is newly discovered evidence that would lead to a substantial or significant possibility of a different result in the Petitioners' respective trials.

The State argues that, in the first sentence, the words "would have been different" simply were deleted, and this sentence shows that the court did address the substantial possibility prong and resolved it against appellant. Although that is one possibility, a review of the entire memorandum opinion suggests the more likely possibility that the denial of the petition was based on the second requirement, due diligence, and the first sentence, which is incomplete, was intended to be cut, or rewritten, as opposed to words being inadvertently omitted. We are not persuaded that the court conducted an independent analysis of the third requirement, the substantial possibility of a different result.

That presents a problem for review of this requirement by this Court, which reviews the circuit court's decision for an abuse of discretion. Indeed, the statute provides, contrary to the State's argument that we presume that the court correctly applied the statute, that the court "shall state the reasons for its ruling on the record." CP § 8-301(f)(2). The court here did not give its reasons for a finding, if any, that the tapes and the palm print evidence did not create a substantial or significant possibility of a different result in appellant's trial. As indicated, that is a trial court function that we review for an abuse of discretion. *See Jackson v. State*, 164 Md. App. 679, 713-14 (2005) ("It is not for an appellate court to decide whether it thinks a piece of newly discovered evidence might have made a difference" in appellant's trial; that is for the trial judge, "who is uniquely competent to

assess whether the new evidence is worthy of being credited" and whether there was a substantial possibility it would have led to a different result.).

Indeed, in *Thompson v. State*, 411 Md. 664, 683-84 (2009), where the circuit court, in the context of a CP § 8-201 claim, applied the wrong standard, i.e., whether the evidence "will exculpate the Petitioner," the Court of Appeals remanded the case to the circuit court to consider, under the appropriate test, whether a "substantial possibility exists that the petitioner would not have been convicted."  We also will remand the case to the circuit court to consider whether, if the jury that convicted appellant had the benefit of the Bollinger-Haddaway tapes and the palm print evidence, there is a substantial or significant possibility that the result of the trial would have been different.  The circuit court will determine whether presentation of new evidence will be permitted on remand.

### D.

### Evidentiary Issues

Appellant contends that the circuit court erred in curtailing his ability to present evidence at the innocence hearing that implicated Ty Brooks in Ms. Wilford's murder. Specifically, he asserts that the court erred: (1) in precluding him from calling Ty Brooks as a witness on the ground that he was incompetent to testify based on his out-of-state perjury conviction; and (2) in redacting Ty Brooks' name from Mr. Thomas' statement implicating the two of them in the murder.

Because we are remanding the case for further proceedings, we need not decide these claims.  On remand, the parties can choose whether to revive these issues, and if so,

the court can determine whether evidence in this regard is admissible in the court's analysis of the substantial possibility of a different result. We will, however, for the guidance of the circuit court, offer a few comments.

**1.**

**Scope of the Admissible Evidence**

As indicated, the appellate courts have explained that the third requirement requires an analysis regarding "whether, if [the convicting] jury had had the benefit of the newly discovered evidence as well as the evidence that was before them, would there be 'a substantial or significant possibility that the result would have been different?'" *Yonga v. State*, 446 Md. 183, 211 (2016) (quoting *Yonga*, 221 Md. App. at 69) (internal quotation marks omitted). *See also Campbell v. State*, 373 Md. 637, 670 (2003) (The trial judge "weighed the newly discovered evidence and considered its significance in relation to the evidence already presented at trial."). Thus, the analysis focuses on the significance of the newly discovered evidence on the verdict.

Here, however, the evidentiary claims involve evidence that is not claimed to be newly discovered.[38] Neither party on appeal addresses whether, in addressing a petition for writ of actual innocence, the court can consider evidence other than the newly discovered evidence in assessing the possibility of a different result. *Compare State v. Hess*, 290 P.3d 473, 476 (Ariz. Ct. App. 2012) (in determining whether newly discovered

---

[38] The circuit court found that Mr. Thomas' statement to the police was made available to the defense at trial, and therefore, it was not newly discovered evidence. This contention has not been challenged on appeal.

evidence probably would result in a different verdict, court should consider other evidence affecting value of new evidence), *with Commonwealth v. Reese*, 663 A.2d 206, 209-10 (Pa. Super. Ct. 1995) (in determining whether newly discovered evidence would have affected the outcome of the trial if it had been introduced, court should not consider other evidence that was not introduced at the original trial).  If, on remand, appellant wants the court to consider the Ty Brooks evidence that is not claimed to be newly discovered evidence, nor evidence presented at trial, the court should assess whether that is appropriate in the context of the CP § 8-301 analysis of the substantial possibility of a different result.  If the court determines that it is appropriate to consider this evidence, we suggest it reassess its original rulings in light of the following discussion.

## 2.

### Ty Brooks

Appellant's first claim is that the circuit court erroneously precluded him from calling Ty Brooks, a convicted perjurer, as a witness at the hearing.[39]  The court's decision barring testimony by Ty Brooks was based on Md. Code (2015 Supp.) § 9-104 of the Courts and Judicial Proceedings Article ("CJP"), which at the time of the hearing stated: "A person

---

[39] Appellant also claims that the court erred in precluding him from playing a portion of Ty Brooks' 2015 recorded police interview in which he stated that he "terrorized Easton," admitting that he committed numerous robberies and burglaries in the area.  He stated, however, that he did not remember Ms. Wilford's house, that murder was not his "MO."  Defense counsel argued that these statements were not offered for the truth of the matter asserted, "but for the opposite of the truth—as false denials demonstrating his consciousness of guilt—and they were admissible as nonhearsay."  Although it is not clear to us how these statements showed consciousness of guilt, that will be an issue for the circuit court to address on remand if appellant seeks again to introduce it.

convicted of perjury may not testify." The parties on appeal dispute the applicability of this statute to out-of-state perjury convictions.

Although this presents an interesting issue, it will not be relevant to the proceedings on remand. The General Assembly repealed CJP § 9-104, effective October 1, 2016. The effect of a prior perjury conviction is now addressed in CJP § 10-905(c), which states: "Evidence that a witness has been convicted of perjury shall be admitted for the purpose of attacking the credibility of the witness, regardless of the date of the conviction, if the evidence is elicited from the witness or established by public record during examination of the witness." Accordingly, on remand, Ty Brooks' perjury conviction will no longer be a bar to his testimony.

**3.**

**Redacting Ty Brooks' Name from James Brooks' Statement**

Appellant's second evidentiary claim involves James Brooks' statement that Mr. Thomas advised that he and Ty Brooks killed Ms. Wilford. The court precluded reference to Ty Brooks, noting that a "statement against penal interest . . . applies to the declarant not some other person." It ruled that counsel could ask James Brooks if Mr. Thomas "might have had an accomplice," but counsel could not attempt to elicit an identification of any accomplice because the "particular identification of who the accomplice is . . . goes beyond [a] statement against penal interest."

In *State v. Matusky*, 343 Md. 467, 482 (1996), the Court of Appeals applied a more nuanced test. It held that, in determining the admissibility of a declaration against the penal

interest of an unavailable declarant, the court should review "the entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy."

We note, however, that the circuit court's comments suggest that it found James Brooks' statement to be suspect, indicating that the statement did not warrant much weight because it was "at best, equivocal." In that regard, the court stated:

> The problem with the Petitioners' assertion [that James Brooks' statement was reliable] is that stabbing Mrs. Wilford and leaving her dead is contradicted by the forensic evidence that was adduced at trial. She must have come in the house and placed her groceries on the table before being confronted by her assailants. The evidence revealed that she had been stabbed repeatedly. There were broken knife blades on the floor around her body. Further, the knife wounds indicated that she was in a defensive posture and, therefore, there appeared to have been something of a struggle between Mrs. Wilford and her assailant(s). Also, the most compelling image of Mrs. Wilford is that she was lying on her back with a knife jammed into her cheek. None of this evidence suggests the possibility that she could have been stabbed in the back and left for dead.

> Although [James] Brooks did not recant his statement that Boozie Thomas had told him that he had killed Mrs. Wilford, the court finds his testimony as being, at best, equivocal. He said that he was on drugs and that he had been high for several days and that Boozie Thomas and he were high at the time that he made the alleged statement. He also testified that when he was a drug addict he did some bad things and now wanted to set things right. He told this story because he believed that he could get reward money.

On remand, if appellant seeks to pursue this evidentiary issue, the court can clarify whether James Brooks' statement warrants any weight in the analysis whether the newly discovered evidence creates a substantial or significant possibility of a different result.

## II.

### Motion to Reopen Post-Conviction Proceedings

After the circuit court concluded that it would not grant appellant's petition for writ of actual innocence, the court turned to appellant's motion to reopen his post-conviction proceeding. In that context, it addressed only the Bollinger-Haddaway tapes, and it found that the discovery of these tapes did not warrant reopening post-conviction proceedings because "[a]dditional impeaching evidence against Ms. Haddaway does not necessarily mean that the testimony of the other witnesses becomes less credible."[40] The court noted that the "arrangement regarding Landon Janda does not contradict any other evidence presented," and it was not a precondition to Ms. Haddaway providing information that led to the arrest of appellant. Accordingly, the court stated that it did "not believe that it would advance the interests of justice to reopen the post-conviction proceedings."

Appellant contends that the circuit court "erred in denying [his] motion to reopen and by not granting postconviction relief." He argues that the court "abused its discretion because it ignored nearly all of the evidence and claims [appellant] presented in his motion to reopen, exclusively addressing the suppression of the Haddaway Tapes." Appellant asserts that the tapes were "only a single facet" of the "cascade of innocence evidence and

---

[40] In that regard, the court earlier in its opinion noted that Ms. Haddaway's testimony was corroborated by Mr. Andrews and appellant's three separate confessions, to Sergeant Bollinger, Ms. Haddaway, and Mr. Snow. We also note that, in his confession to Sergeant Bollinger, appellant accurately stated that Ms. Wilford was wearing a blue coat and had glasses on a chain around her neck, and Sergeant McCauley testified that he had reviewed various newspaper articles from 1987 through 1999, and none of these articles contained a description of what Ms. Wilford was wearing when she was killed.

the indisputable proof of serious constitutional violations that marred [his] trial proceedings," all of which demonstrate that it is in the interests of justice to grant his motion to reopen.

The State does not dispute that the circuit court's order denying appellant's motion to reopen should be vacated, and it argues that the proceedings should be remanded to the circuit court for further consideration. We agree.

The circuit court "may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." CP § 7-104. The court must exercise discretion when ruling on a motion to reopen post-conviction proceedings, which "prevents the court from acting arbitrarily." *Gray v. State*, 388 Md. 366, 382 (2005). The record must reflect that the court's discretion "was in fact exercised." *Id.* at 384.

Here, the record does not indicate that the court properly exercised its discretion in deciding the motion to reopen post-conviction proceedings for several reasons. Initially, as noted by the State, the circuit court issued an order setting forth the schedule for the proceedings, which provided that the petitions for writ of actual innocence be addressed first, and separate from, the motions to reopen. Following this schedule, the court heard opening arguments, received evidence, and heard closing arguments on the petitions for writ of actual innocence. On the last day of this hearing, which the State asserts lasted more than 11 hours, the court advised that it would "take th[e] matter sub curia." Contrary to the ordered schedule, and without hearing additional evidence or separate argument on

the motions to reopen, the court then decided both the petitions for writ of actual innocence and the motions to reopen, without providing any explanation for the change in procedure.

Moreover, the court's opinion indicates that it did not consider all of appellant's claims. Although a court is not required to explain its reasons for denying a motion to reopen, *see Gray*, 388 Md. at 381, the record reflects that the circuit court mischaracterized the basis of the motion as including only one ground. In its written memorandum, the court characterized the Bollinger-Haddaway tapes as "the basis" for appellant's motion, where the motion actually encompassed several claims, including an ineffective assistance of counsel claim. Under these circumstances, we conclude that the court abused its discretion in denying the motion to reopen post-conviction proceedings.

Accordingly, we vacate the circuit court's judgments denying appellant's petition for writ of actual innocence and his motion to reopen post-conviction proceedings and remand to the circuit court for further proceedings.

**JUDGMENTS OF THE CIRCUIT COURT FOR TALBOT COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY TALBOT COUNTY.**